# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

Civil Action No. 1:19-cv-00950

**JANE DOE,** through her mother and next friend **MEGAN DOE**;

      Plaintiff;

v.

**BRIGHTON SCHOOL DISTRICT 27J**;

**CHRIS FIELDER**, individually, and in his official capacity as superintendent of Brighton 27J School District;

**SHELLY GENEREUX**, individually, and in her official capacity as a principal with Brighton 27J School District;

**DAVID SMITH**, individually, and in his official capacity as an assistant principal with Brighton 27J School District;

**JANELLE WEAVER**, individually, and in her official capacity as an assistant principal with Brighton 27J School District;

**DESIREE QUINTANILLA**, individually, and in her official capacity as an Intervention Specialist with Brighton 27J;

      Defendants.

---

## COMPLAINT WITH JURY DEMAND

---

Plaintiff Jane Doe ("Ms. Doe") ("Plaintiff"), through her mother and next friend Ms. Megan Doe ("Ms. Megan Doe" or "Mother") hereby respectfully files this action against Defendants Brighton School District 27J ("The District" or "Brighton 27J"), Chris Fielder ("Mr. Fielder"), Shelly Genereux ("Ms. Genereux"), David Smith ("Mr. Smith"), Janelle Weaver ("Ms. Weaver"), and Desiree Quintanilla ("Ms. Quintanilla") (collectively, "Defendants"), through the undersigned counsel of record Kishinevsky & Raykin, Attorneys at Law, and state on information and belief as follows.

1

## I.      NATURE OF THE CASE

1.   This is a civil action seeking declaratory, injunctive, and other appropriate equitable relief to enjoin and restrain the deprivation, under color of state law, of Plaintiff's rights, privileges, and immunities as guaranteed by the Constitution and law of the United States, as more fully hereinafter appears.  This action seeks redress for violations of, and seeking redress under, federal law, including but not limited to the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution, 42 U.S.C. § 1983; 42 U.S.C. § 1988; 20 U.S.C. § 1681-1688 (Title IX of the Education Amendments of 1972).  All discriminatory conduct alleged herein occurred in a public-school setting.

## II.      JURISDICTION, PARTIES AND VENUE

2.    Jurisdiction is conferred upon this Honorable Court pursuant to 28 U.S.C. § 1331 and is founded upon the deprivation, under color of State law, of Plaintiff's rights, privileges, and immunities guaranteed by the Constitution of the United States, and more particularly under the Fourteenth Amendment to the United States Constitution, 42 U.S.C. § 1983; 42 U.S.C. §1988; 20 U.S.C. § 1681-1688 (Title IX of the Education Amendments of 1972); 42 U.S.C. § 12101 (The Americans with Disabilities Act); and 29 U.S.C. 701 and 794 (Section 504 of the Rehabilitation Act of 1973).

3.    Plaintiff is a resident of the city of Brighton, Colorado, in Adams County, Colorado.

4.   The District is likewise located in Colorado and educates Colorado students in Adams County.  The District is a resident of Adams County, Colorado.  Colo. Const. Art. 9, § 2.

5.   The remaining individual defendants are residents of Colorado, and all of them were District employees at the time of the alleged wrongdoings herein.

6. The wrongful acts alleged by Plaintiff occurred in whole or in part in Adams County, Colorado.

7. Venue is proper in this Court under 28 U.S.C. § 1391(b)(2).

### III.   FACTUAL ALLEGATIONS

8. Ms. Doe is a student enrolled at Brighton High School ("BHS"), a school in Brighton 27J School District.

9. On or about September 17, 2018, Ms. Doe was sexually assaulted and raped by another BHS student, [STUDENT 1]. The sexual assault and rape occurred at Ms. Doe's residence.

10. Following the sexual assault and rape that occurred at Ms. Doe's residence on or about September 17, 2018, [STUDENT 1] engaged in unlawful sexual contact against Ms. Doe on BHS school grounds.

11. On multiple occasions on BHS grounds, [STUDENT 1] groped Ms. Doe, and he put his hands on her body despite Ms. Doe telling him to stop.

12. On or about October 30, 2018, Detective Lara-Rush ("Ms. Rush") of the Adams County Sheriff's Department called Ms. Doe's mother ("Mother"). Ms. Rush informed Mother that [STUDENT 1] had sexually assaulted Ms. Doe.

13. Ms. Rush informed Mother that [STUDENT 1] had sexually assaulted and/or had engaged in unlawful sexual contact with another female student, [STUDENT 2], who attended BHS in May of 2018.

14. Ms. Rush informed Mother that she had informed BHS officials in May 2018 that [STUDENT 1] had sexually assaulted and/or engaged in unlawful sexual contact against [STUDENT 2].

15. Ms. Rush initially reported to BHS that [STUDENT 1] sexually assaulted and/or engaged

in unlawful sexual contact against [STUDENT 2] on May 10, 2018.

16. BHS officials had actual knowledge that [STUDENT 1] sexually assaulted and/or engaged in unlawful sexual contact against a female BHS student no later than May 10, 2018.

17. Ms. Rush informed Mother that she would personally inform BHS officials of [STUDENT 1]'s sexual assault and rape of Ms. Doe.

18. On or about November 1, 2018, Ms. Rush informed BHS assistant principal David Smith ("Mr. Smith") that [STUDENT 1] had sexually assaulted Ms. Doe.

19. Ms. Rush informed Mr. Smith that Ms. Doe was the second victim of [STUDENT 1].

20. Ms. Rush informed Mr. Smith that [STUDENT 1] needed to be segregated from Ms. Doe and that a safety plan for Ms. Doe had to be put in place because she and [STUDENT 1] could not be in the same class.

21. Mr. Smith had actual knowledge that [STUDENT 1] sexually assaulted and raped Ms. Doe no later than November 1, 2018.

22. On or about October 31, 2018, BHS counselor Ryan Sullivan ("Mr. Sullivan") called Mother and informed her that Ms. Doe was not being herself and seemed very troubled.

23. Mother informed Mr. Sullivan that she could not share all of the details because a forensic interview had not been done, but that something very horrific had happened to Ms. Doe.

24. On or about November 2, 2018, Ms. Rush called Mother and Ms. Doe to schedule a forensic interview.

25. On November 5, 2018, a forensic interview occurred at Ralston House, a support center for child victims of abuse.

26. At this point, November 5, 2018, despite the fact that Mr. Smith had known of [STUDENT

1]'s sexual assault of Ms. Doe, his second sexual assault of a BHS student, since November 1, BHS officials still had not taken any disciplinary action against [STUDENT 1] to remove him from school and to prevent him from having contact with Ms. Doe.

27. Under Colorado law, a student may be suspended or expelled for up to a year for any "behavior on or off school property that is detrimental to the welfare or safety of other pupils or of school personnel, including behavior that creates a threat of physical harm to the child or to other children."  C.R.S. § 22-33-106(1)(c).

28. The District could have easily taken steps to suspend [STUDENT 1], keep him out of school, recommend him for expulsion, and then have him expelled.

29. On November 6, 2018, Mother made an appointment for Ms. Doe to see a counselor.

30. On or about November 6, 2018, Mr. Sullivan called Mother, who fully informed him of the sexual assault and rape.

31.  Mother asked Mr. Sullivan for options for Ms. Doe whose mental and emotional health had deteriorated such that she could no longer force herself to go to school.

32.  Mother asked Mr. Sullivan why [STUDENT 1] was still attending BHS where he can come into contact with Ms. Doe.

33.  Mr. Sullivan informed Mother that the only options for Ms. Doe were to change schools, leave class five to ten minutes early to avoid other students in the hallways, or to use homebound services.

34.  Mother then contacted Ms. Desiree Quintanilla ("Ms. Quintanilla") an Intervention Specialist with Brighton 27J and left a voicemail seeking a call back.

35.  Mr. Sullivan called Mother that same evening and did not provide her with any other options to help Ms. Doe at school.

36. Neither Mr. Sullivan, nor Mr. Smith, nor any BHS official had offered to remove [STUDENT 1] from BHS, nor had they taken any action to prevent [STUDENT 1] from having contact with Ms. Doe at BHS.

37. Mother informed Mr. Sullivan that despite having previously little contact with Ms. Doe at BHS, [STUDENT 1] was now everywhere Ms. Doe would go in school.

38. Mother informed Mr. Sullivan that [STUDENT 1] was intimidating Ms. Doe.

39. Mother informed Mr. Sullivan that [STUDENT 1]'s friends were talking loudly at BHS, saying that Ms. Doe and girls were trying to ruin [STUDENT 1]'s life.

40. Mother informed Mr. Sullivan that these comments were directed towards Ms. Doe, that they occurred frequently, and that they caused Ms. Doe such severe stress that she came home from BHS in hives.

41. Mr. Sullivan had actual knowledge of reports of [STUDENT 1], [STUDENT 1]'s friends, and other BHS students intimidating Ms. Doe and directing hostile verbal comments towards Ms. Doe because she reported the sexual assault and rape committed by [STUDENT 1] no later than November 6, 2018.

42. On or about November 7, 2018, Mother contacted BHS assistant principal Janelle Weaver ("Ms. Weaver") twice and left voicemails both times.

43. On or about November 7, 2018, Mr. Sullivan contacted Mother again, and again he could not provide any options that would remove [STUDENT 1] from BHS.

44. Ms. Doe spoke with Mr. Sullivan on November 7, 2018, and she told him that she felt that she was being punished for speaking up and that she is tired of the school because it hurts victims.

45. On or about November 7, 2018, Mother contacted Ms. Quintanilla again and again left a

voicemail seeking a call back because Ms. Doe was being intimidated by [STUDENT 1] and his friends every day at BHS.

46. Ms. Quintanilla had actual knowledge that Ms. Doe was being intimidated by [STUDENT 1] and his friends on a daily basis no later than November 7, 2018.

47. On or about November 7, 2018, Mother contacted the office of Brighton 27J's superintendent Chris Fielder ("Mr. Fielder") and explained in detail Ms. Doe's sexual assault and rape and the harassment and intimidation Ms. Doe was receiving on a daily basis at BHS to the receptionist who answered the phone in Mr. Fielder's office.

48. Mother was transferred to the line of Director of Student achievement and Professional learning for Brighton 27J, Dr. Richard Patterson ("Dr. Patterson").

49. Mother left a voicemail for Dr. Patterson in which she described in detail the sexual assault and events at BHS and her attempts at communication with BHS officials. Mother also told Dr. Patterson of the inadequacy of the options she had been given. Mother also told Dr. Patterson of Ms. Doe's deteriorating mental health that has now become so bad that Ms. Doe has expressed her desire to die.

50. On information and belief, Mr. Fielder would have been informed of Mother's phone call to his office, and therefore knew of the sexual assault and rape of Ms. Doe and the ongoing, daily intimidation and harassment Ms. Doe was experiencing at BHS.

51. Mr. Fielder did not address Ms. Doe's sexual assault and rape, nor did he address the intimidation and harassment Ms. Doe experienced at BHS.

52. On or about November 7, 2018, Ms. Weaver finally called Mother back. Mother again described the sexual assault and rape of Ms. Doe and Ms. Doe's subsequent experiences at BHS. Mother again told Ms. Weaver that since the sexual assault, Ms. Doe was being intimidated by

[STUDENT 1] and his friends at BHS, and that as a result of the intimidation, Ms. Doe wanted to die.

53. Ms. Weaver had actual knowledge that since Ms. Doe's sexual assault and rape, [STUDENT 1] and his friends were intimidating Ms. Doe at BHS, no later than November 7, 2018. Mother again asked for options to help Ms. Doe at BHS.  Ms. Weaver offered the same options that had previously been offered to Ms. Doe: move to a new school, receive homebound services, or leave class five to ten minutes early to avoid [STUDENT 1] in the hallway.  Ms. Weaver did not suggest or offer to have [STUDENT 1] removed from BHS or suggest or offer any way to prevent [STUDENT 1] from having contact with Ms. Doe.

54. Mother expressed her dissatisfaction with these options and explained that Ms. Doe's emotional state was such that she could not handle more than attending BHS for math and chemistry.

55. Mother again expressed concern that [STUDENT 1] was still at BHS and no steps had been taken to discipline him or remove him from school in order to prevent him from contacting Ms. Doe.

56. Ms. Weaver told Mother that [STUDENT 1] had just as much of a right to be at BHS as Ms. Doe had.

57. Ms. Weaver told Mother that she could not do anything about [STUDENT 1] until charges had been filed because at that time it was only an accusation of rape.  BHS officials and Ms. Weaver were of course aware that this was the second time [STUDENT 1] had been accused of sexually assaulting a BHS student as Ms. Rush had informed BHS officials on May 10, 2018, of [STUDENT 1]'s sexual assault of [STUDENT 2].

58. On or about November 7, Mother wrote an email to Mr. Sullivan and informed him that

Ms. Doe "came home a complete mess over this situation and with hearing more and more rumors."

59.   Mother told Mr. Sullivan that Ms. Doe "is a mental mess and in hives all over her body. This school is making her the victim feel as if she did something wrong.  I'm very disappointed in how this is being handled on every end and I encourage girls to not speak up because honestly it's not worth it.  Not at this school."

60.   Mother also emailed Mr. Smith on or about November 7, 2018.  Mother told Mr. Smith that the school was making a victim feel like a predator, and that Ms. Doe "can't handle any more stress and this school is causing permanent harm."

61.   On or about November 8, 2018, Ms. Quintanilla called Mother back.  Mother again described [STUDENT 1]'s sexual assault and rape of Ms. Doe.  Mother again described the deterioration of Ms. Doe's emotional and mental health following the sexual assault and BHS's lack of response.

62.   Mother asked Ms. Quintanilla if [STUDENT 1] could be kicked out of school.  Ms. Quintanilla told Mother that he could not be.

63.   On or about November 8, 2018, Dr. Patterson returned Mother's phone call and told Mother that Ms. Quintanilla will handle the situation.

64.   On or about November 8, 2018, Ms. Quintanilla called Mother and informed her that [STUDENT 1] had finally been suspended from school for five days.  A full week had passed since Ms. Rush had informed BHS officials that [STUDENT 1] had sexually assaulted and raped Ms. Doe, the second BHS student he had sexually assaulted.

65. On or about November 9, 2018, Mother took Ms. Doe to see a new counselor, Seana

Malone ("Ms. Malone").  Ms. Malone determined that Ms. Doe suffered extensive emotional and mental damage from the sexual assault and rape as well as from her experiences at BHS.

66. Ms. Malone recommended Ms. Doe see a pediatrician in order to get a prescription of depression medication.

67. On or about November 9, 2018, Mr. Smith called Mother and told her that Ms. Weaver was finally attempting to come up with a plan for Ms. Doe's academics over a week after BHS officials were aware of the sexual assault and rape.

68. Mother told Mr. Smith that Ms. Doe has been intimidated at BHS, and that she feels like BHS has not done enough to protect Ms. Doe since the sexual assault and rape from bullying and intimidation from [STUDENT 1] and his friends.  Mr. Smith claimed he did not know of the bullying that Ms. Doe had been experiencing at BHS since the sexual assault and rape.  Mr. Smith told Mother that if something else happens, Ms. Doe should contact BHS officials.  Mr. Smith told Mother that he needs to get names before he can do anything about bullying.

69.  Ms. Weaver and Ms. Quintanilla called Mother on or about November 9, 2018.  Ms. Weaver and Ms. Quintanilla refused Mother's requests for a 504 plan or an IEP for Ms. Doe.  Ms. Weaver and Ms. Quintanilla also refused to answer Mother's questions about [STUDENT 1] and if he would be allowed back at BHS.

70.  Mother told Ms. Weaver and Ms. Quintanilla that Ms. Doe is terrified of the fallout following [STUDENT 1]'s suspension.  Ms. Weaver and Ms. Quintanilla would not answer whether [STUDENT 1] would be able to come back to BHS, nor would they answer whether there is a plan in place for if he were to return to BHS.

71.  Mother told Ms. Weaver and Ms. Quintanilla on the phone call that Ms. Doe came home

from school in hives, that she did not want to live, and that she wished she would have just kept quiet.

72.  Ms. Weaver and Ms. Quintanilla on the phone call told Mother in response to her question about whether there will be measures to address the bullying Ms. Doe has experienced at BHS that bullying is going to happen.

73.  Following Mother's phone call on or about November 9, 2018, with Ms. Weaver and Ms. Quintanilla, a conference was held at BHS with Mother, Ms. Weaver, Ms. Quintanilla, Mr. Smith, and Ms. Doe.  At this conference, Mother again informed Ms. Weaver, Ms. Quintanilla, and Mr. Smith that Ms. Doe has been subjected to bullying at BHS since the sexual assault and rape.

74.  [STUDENT 1]'s friends have been following Ms. Doe around BHS saying she is trying to ruin [STUDENT 1]'s life by lying.

75.  A student referred to Ms. Doe as a whore or a slut in the hallway.

76.  The bullying and harassment of Ms. Doe had been continual since she reported the sexual assault and rape.

77.  Mr. Smith acknowledged that he knew of the bullying because Mother had told him and BHS officials.

78.  During the conference with Mother, Ms. Weaver, Ms. Quintanilla, Mr. Smith, and Ms. Doe, BHS officials would not answer direct questions about [STUDENT 1] but would only speak in hypotheticals about a hypothetical sexual assault and subsequent bullying.

79.  Mother told Mr. Smith, Ms. Quintanilla, and Ms. Weaver that the sexual assault and rape and the bullying Ms. Doe has experienced at BHS has affected Ms. Doe's mental health.  Ms. Doe has not been sleeping, she has been eating less, and her demeanor has changed.

80.  Mother asked Mr. Smith, Ms. Weaver, and Ms. Quintanilla to evaluate Ms. Doe for any

additional services she might need, including a 504 plan, which is used to assist students with disabilities, including emotional disabilities.

81. Ms. Doe had been diagnosed with emotional disabilities.

82. Mr. Smith, Ms. Weaver, and Ms. Quintanilla rejected the idea of evaluating Ms. Doe for special education, including an Individualized Education Program ("IEP") or a 504 plan because they explained that she was in crisis and the evaluation would be skewed.  Mr. Smith, Ms. Weaver, and Ms. Quintanilla rejected providing Ms. Doe with accommodations under a 504 plan.

83.  On December 4, 2018, [STUDENT 1] returned to BHS campus, despite still being suspended.

84.  On December 4, 2018, [STUDENT 1] was on BHS campus for several hours.

85. [STUDENT 1] believed his suspension was over and that he was allowed to return to BHS.

86. In a phone call with Ms. Weaver on December 4, 2018, Mother tells Ms. Weaver that another female student, [STUDENT 3], repeatedly asked Ms. Doe during math class about [STUDENT 1].  [STUDENT 3] asked Ms. Doe repeatedly where [STUDENT 1] is and what happened to him.  Ms. Doe's math teacher did not step in and stop [STUDENT 3]'s harassment of Ms. Doe until she repeated the questions multiple times without a response from Ms. Doe.

87. Mother told Ms. Weaver during the December 4 phone call that damage is being done to Ms. Doe such that she has to see another doctor the following morning.  Mother expressed her concern that the intimidation, harassment, and bullying will only get worse if people saw [STUDENT 1] on campus.

88. On December 4, 2018, Mother left a message for Ms. Weaver informing Ms. Weaver that [STUDENT 1]'s new car had been seen on BHS campus multiple times and that [STUDENT 1] had been on BHS grounds for lunch with his friends every day.

89. Mother told Ms. Weaver in the December 4 message that Ms. Doe had seen the red car that belonged to [STUDENT 1] before, but only learned it belonged to [STUDENT 1] just then.

90. On December 5, 2018, Mother spoke with Ms. Weaver and Mr. Smith on the phone.

91. Mother told Ms. Weaver and Mr. Smith during the December 5 phone call that Ms. Doe had a 47-minute panic attack when she saw all of [STUDENT 1]'s friends gathered around the car, and that the panic attack was so severe that she believed she would have to take Ms. Doe to the hospital because her chest started hurting.

92. Mother told Ms. Weaver and Mr. Smith during the December 5 phone call that the lack of security at BHS was hard on Ms. Doe's emotional well-being, but that the fact that [STUDENT 1] had been on BHS campus had made it a nightmare.

93.  Ms. Weaver and Mr. Smith told Mother on the December 5 phone call that the SRO had been given a description of the car and that the SRO is prepared to hand out a citation for trespassing, but that Ms. Doe needs to let BHS officials know who she saw next to the car.

94.  On or about December 6, 2018, Mother had a conversation with Ms. Quintanilla to express her frustration with BHS's lack of response to Ms. Doe's sexual assault and rape and subsequent bullying.

95. Mother told Ms. Quintanilla on the phone call that she is at a standstill and that there is no protection in place for Ms. Doe.

96. Ms. Quintanilla claimed to Mother that it is almost impossible to guarantee people won't come to BHS campus, and admitted that it was BHS's miscommunication with [STUDENT 1] that caused him to believe he could return to BHS.

97. Ms. Quintanilla told Mother that the only way that BHS can ensure that Ms. Doe would

not be exposed to [STUDENT 1] would be for Ms. Doe to stay at home and not come to BHS campus.

98. Ms. Quintanilla admitted to Mother that [STUDENT 1] had been on campus hours before any BHS official became aware and clarified that he could not be there.

99. Mother informed Ms. Quintanilla on the December 6 phone call that having to get the names of [STUDENT 1]'s friends had caused Ms. Doe to have a panic attack.

100.    Mother told Ms. Quintanilla that Ms. Doe has been diagnosed with severe PTSD, anxiety, and depression.

101.    Ms. Doe's mental and emotional health continued to deteriorate following the sexual assault and rape and the bullying she experienced at BHS.  Mother had to take Ms. Doe to the hospital because Ms. Doe had threatened suicide.

102.    Ms. Doe's mental and emotional health continued to suffer into January 2019.  On January 8, 2019, Mother reported to Ms. Weaver that Ms. Doe continued to suffer horrific panic attacks.

103.     Mother reported to Ms. Weaver on or about January 8, 2019, that Ms. Doe had been experiencing constant verbal harassment at BHS and on social media from BHS students because she came forward and reported the sexual assault and rape.

104.    Mother reported that Ms. Doe was forced to take down all social media because the harassment was so severe.

105.    On or about February 9, 2019, Mother reported to Ms. Rush that [STUDENT 1]'s girlfriend, [STUDENT 4], had messaged Ms. Doe on Instagram asking Ms. Doe "what did you want to gain from accusing [STUDENT 1] of all the things you did."

106.     In the Instagram message reported by Mother to Ms. Rush on or about February 9,

2019, [STUDENT 4] further stated "I hope no one ever forgives you."

107.     [STUDENT 4] accused Ms. Doe of seeking attention and lying about sexual assault and rape.

108.     Mother reported to Ms. Rush on or about February 9, 2019, that Ms. Doe also received harassment on Snapchat.

109.     Mother reported to Ms. Rush on or about February 9, 2019, that Ms. Doe attempted to kill herself as a result of the Instagram message from [STUDENT 4].

110.     The only response from BHS was to require [STUDENT 4] to sign a contract stating that she would not contact Ms. Doe again.

111.      Since the sexual assault and rape, Ms. Doe could not escape harassment directed at her about the sexual assault and rape.

112.     Ms. Doe felt exiled from school because the harassment about the sexual assault and rape from other students would not stop.

113.     Ms. Doe has been unable to return to BHS for classes.  She has been forced to enroll in homebound services to complete her school work.

114.     On information and belief, Shelly Genereux ("Ms. Genereux"), as principal of BHS, would have been informed of [STUDENT 1]'s prior sexual assault of a BHS student in May 2018, [STUDENT 1]'s sexual assault and rape of Ms. Doe and the intimidation and harassment Ms. Doe had been experiencing daily at BHS and communicated about these events with BHS assistant principals, Mr. Smith and Ms. Weaver.

115.     Ms. Genereux did not take steps to address Ms. Doe's sexual assault and rape and the subsequent bullying, harassment, and intimidation Ms. Doe experienced at BHS.

## IV.   LEGAL OVERVIEW

116.     Section I of the Fourteenth Amendment to the United States Constitution provides that no State shall "deny to any person within its jurisdiction the equal protection of the laws."

117.     Consistent therewith, on June 23, 1972 the President signed Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681 *et seq.* ("Title IX").  Pub. L. 92-318, Title IX, §901.  In pertinent part, Title IX provides, "No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance …." 20 U.S.C. § 1681(a).  Title IX expressly contemplates within its nondiscrimination mandate "any public or private preschool, elementary, or secondary school…."  *Id.* at (c).

118.     A state is not immune under the Eleventh Amendment to the United States Constitution from suit in Federal court for a violation of Title IX.  42 U.S.C. § 2000d-7.

119.     Each Federal department and agency which is empowered to extend Federal financial assistance to any education program or activity, by way of grant, loan, or contract, is authorized to effectuate Title IX by way of rules, regulations, or orders.  20 U.S.C. § 1682.

120.     The Office for Civil Rights, United States Department of Education regulations adopted pursuant to sections 1681 and 1682 at issue in this action are embodied in Chapter I of Subtitle B of Title 34 of the Code of Federal Regulations.  Specifically, 34 C.F.R. § 106.31(b) prohibits recipients of Federal funds from:

> (1) Treat[ing] one person differently from another in determining whether such person satisfies any requirement or condition for the provision of such aid, benefit, or service;

16

(2) Provid[ing] different aid, benefits, or services or provide aid, benefits, or services in a different manner;

(3) Deny[ing] any person any such aid, benefit, or service;

(4) Subject[ing] any person to separate or different rules of behavior, sanctions, or other treatment;

(5) Apply[ing] any rule concerning the domicile or residence of a student or applicant, including eligibility for in-state fees and tuition;

(6) Aid[ing] or perpetuat[ing] discrimination against any person by providing significant assistance to any agency, organization, or person which discriminates on the bases of sex in providing any aid, benefit or service to students or employees;

(7) Otherwise limit[ing] any person in the enjoyment of any right, privilege, advantage, or opportunity.

121.    Each recipient of Federal funds must designate at least one employee to coordinate its efforts to comply with and carry out its responsibilities under Title IX. 34 C.F.R. § 106.8(a). This obligation includes any investigation of any complaint communicated to such recipient alleging its noncompliance with Title IX. *Id.* Each recipient must notify all its students of the name, office address, and telephone number of the responsible employee. *Id.* Further, recipients must adopt and publish grievance procedures providing for prompt and equitable resolution of student complaints alleging any action prohibited by Title IX. *Id.* at (b).

122.    Whether or not a student files a complaint of alleged sexual misconduct or otherwise asks a school to take action, where a school knows or reasonably should know of an incident of sexual misconduct it must take steps to understand what occurred and to respond

appropriately.  U.S. Dept. of Educ., O.C.R., Revised Sexual Harassment Guidance: Harassment of Students by School Employees, Other Students, or Third Parties, p. 12 (Jan. 2001)(herein "2001 Guidance"), *available at https://tinyurl.com/yaeajxkz*.  In particular, when sexual misconduct is so severe, persistent, or pervasive as to deny or limit a student's ability to participate in or benefit from the school's programs or activities, then a hostile environment exists, and the school must respond.  *Davis v. Monroe Cnty. Bd. of Educ.*, 526 U.S. 629, 631 (1999); 34 C.F.R. § 106.31(a).

123.      Schools are required by the Title IX regulations to adopt and publish a policy against sex discrimination and grievance procedures providing for the prompt and equitable resolution of complaints of discrimination on the basis of sex. 2001 Guidance, p. 19.  Accordingly, regardless of whether harassment occurred, a school violates this requirement of the Title IX regulations if it does not have those procedures and policy in place.  *Id.*

124.      "[W]hen sexual misconduct is so severe, persistent, or pervasive as to deny or limit a student's ability to participate in or benefit from the school's programs or activities, a hostile environment exists and the school must respond."  *Q&A on Campus Sexual Misconduct*, U.S. Dept. of Educ., Office for Civil Rights, Sept. 2017, p. 1.  "OCR considers a variety of related factors to determine if a hostile environment has been created….  OCR considers the conduct from both a subjective and objective perspective.  In evaluating the severity and pervasiveness of the conduct, OCR considers all relevant circumstances[.]".  *Revised Sexual Harassment Guidance: Harassment of Students by School Employees, Other Students, or Third Parties*, U.S. Dept. of Educ., Office for Civil Rights, Jan. 2001, p. 5.

125.      Title IX regulations do not prescribe particular procedures which a school must put in place, but whatever nondiscrimination policy the school effects must provide effective means for preventing and responding to sexual harassment.  *Davis v. Monroe Cnty. Bd. of Educ.*, 526

U.S. 629, 631 (1999); 34 C.F.R. § 106.31(a). The OCR has identified a number of elements in evaluating whether a school's grievance procedures are prompt and equitable, including whether the procedures provide for:

a. Notice to students, parents of elementary and secondary students, and employees of the procedure, including where complaints may be filed;

b. Application of the procedure to complaints alleging harassment carried out by employees, other students, or third parties;

c. Adequate, reliable, and impartial investigation of complaints, including the opportunity to present witnesses and other evidence;

d. Designated and reasonably prompt timeframes for the major stages fo the complaint process;

e. Notice to the parties of the outcome of the complaint; and

f. An assurance that the school will take steps to prevent recurrence of any harassment and to correct its discriminatory effects on the complaint and others, if appropriate.

2001 Guidance, p. 20.

126.　　In regulating the conduct of students and faculty to prevent or redress discrimination, schools must formulate, interpret, and apply their rules in a manner that respects the legal rights of students and faculty so as to protect academic freedom. 2001 Guidance, p. 22.

127.　　Although there is no specified timeframe under which a school must complete an action, an investigation must be completed within a reasonably prompt timeframe designated by an institution's policy, conducted in a manner that is consistent with the institution's policies and transparent to the accuser and accused with timely notice of meetings and equal access to

information to be used during informal and formal disciplinary meetings and hearing.  34 C.F.R.

§ 668.46(k)(3)(i); 2001 Guidance, ps. 19-21.

128.     An "equitable investigation" includes the following:

> In every investigation conducted under the school's grievance procedures, the burden is on the school – not on the parties – to gather sufficient evidence to reach a fair, impartial determination as to whether sexual misconduct has occurred and, if so, whether a hostile environment has been created that must be redressed.  A person free of actual or reasonably perceived conflicts of interest and biases for or against any party must lead the investigation on behalf of the school.  Schools should ensure that institutional interests do not interfere with the impartiality of the investigation.

> An equitable investigation of a Title IX complaint requires a trained investigator to analyze and document the available evidence to support reliable decisions, objectively evaluate the credibility of parties and witnesses, synthesize all available evidence – including both inculpatory and exculpatory evidence – and take into account the unique and complex circumstances of each case.  Any rights or opportunities that a school makes available to one party during the investigation should be made available to the other party on equal terms.  Restricting the ability of either party to discuss the investigation (e.g., through "gag orders") is likely to deprive the parties of the ability to obtain and present evidence or otherwise to defend their interests and therefore is likely inequitable.  Training materials or investigative techniques and approaches that apply sex stereotypes or generalizations may violate Title IX and should be avoided so that the investigation proceeds objectively and impartially.

> Once it decides to open an investigation that may lead to disciplinary action against the responding party, a school should provide written notice to the responding party of the allegations constituting a potential violation of the school's sexual misconduct policy, including sufficient details and with sufficient time to prepare a response before any initial interview.  Sufficient details include the identities of the parties involved, the specific section of the code of conduct allegedly violated, the precise conduct allegedly constituting the potential violation, and the date and location of the alleged incident.  Each party should receive written notice in advance of any interview or hearing with sufficient time to prepare for meaningful participation.  The investigation should result in a written report summarizing the relevant exculpatory and inculpatory evidence.  The reporting and responding parties and appropriate officials must have timely and equal access to any information that will be used during informal and formal disciplinary meetings and hearings.

U.S. Dept. of Educ., O.C.R., Q&A on Campus Sexual Misconduct, p. 4 (Sept. 2017)(herein "2001 Guidance"), *available at https://tinyurl.com/y99osa9m* (citations ommitted).

## V.      CLAIMS AND CAUSES OF ACTION

A.      **COUNT ONE: 20 U.S.C. § 1681(a)** *et seq.* **– Deliberate Indifference to Sexual Harassment in Violation of Title IX of the Education Amendments of 1972 – Against Brighton School District 27J**

129.      Plaintiff realleges all other paragraphs as if fully set forth herein.

130.      A plaintiff must allege four factors to state a claim of school district liability under Title IX.  She must allege that the district (1) had actual knowledge of, and (2) was deliberately indifferent to (3) harassment that was so severe, pervasive, and objectively offensive that it (4) deprived the victim of access to the educational benefits or opportunities provided by the school. *Murrell v. Sch. Dist. No. 1, Denver, Colo.*, 186 F.3d 1238, 1246 (10th Cir. 1999) (*citing Davis v. Monroe Cnty. Bd. of Educ.*, 526 U.S. 629, 638 (1999)).

131.      Title IX   reaches institutions and programs that receive federal funds, 20 U.S.C. § 1681(a) which may include nonpublic institutions, *id.* at (c), but it has been consistently been interpreted as not authorizing suit against school officials, teachers, and other wrongdoers. *Fitzgerald v. Barnstable Sch. Comm.*, 555 U.S. 246, 257 (2009).

132.      Plaintiff, Ms. Doe, was a Brighton 27J student.  Ms. Doe, as a female, is a member of a suspect class that has been historically an object of invidious discrimination.

133.      Brighton 27J School District, and the individual defendants, at all times relevant to this Complaint acted under color of state law.  Brighton 27J is a subdivision of Adams County, Colorado.

134.      Since no later than May 10, 2018, Defendants had actual knowledge of, and have been deliberately indifferent to, [STUDENT 1]'s sexual assault of [STUDENT 2].

135.     Since no later than November 1, 2018, Defendants had actual knowledge of, and have been deliberately indifferent to, [STUDENT 1]'s sexual assault and rape of Ms. Doe.

136.     Since no later than November 6, 2018, Defendants had actual knowledge of, and have been deliberately indifferent to, reports of intimidation, harassment, and bullying as more fully described above.

137.     As a direct and proximate result of Brighton 27J's deliberate indifference, Ms. Doe was subjected to repeated bullying, intimidation, and harassment at BHS, as more fully described above.  The acts of bullying, intimidation, and harassment were severe, pervasive, and objectively offensive.

138.     The bullying, intimidation, and harassment resulted in Ms. Doe suffering further significant, severe, and ongoing emotional distress and mental anguish.

139.     Defendants' failure to take any action to stop the severe and pervasive bullying, intimidation, and harassment at BHS, despite their authority and obligation to do so, was clearly unreasonable in light of the known circumstances.

140.     Plaintiff was subjected to gender-based discrimination that was so severe, pervasive, and objectively offensive that she was denied access to educational opportunities and benefits.

141.     Brighton 27J elected to shelter and harbor a male student who sexually assaulted a female student in May 2018 and who would go on to sexually assault and rape Ms. Doe, his second victim, by failing to remove him from BHS grounds despite their knowledge of his sexual assault.

142.     Ms. Doe continues to suffer from considerable depression, anxiety, and emotional distress regarding her experience, safety, and well-being.

143.     Ms. Doe's rights to attend classes, advance in, and graduate from her chosen

educational institution have been violated.

144.     Brighton 27J by and through its agents and employees' differing treatment of similarly or equally situated students on the basis of sex is engaging in unlawful and invidious discrimination.

145.     Ms. Doe has suffered damages as a result of Brighton 27J deliberate indifference to its Title IX obligations.

**B.     SECOND CLAIM FOR RELIEF: 20 U.S.C. § 1681(a) *et seq.* – Retaliation in Violation of Title IX of the Education Amendments of 1972 – against Brighton School District** 27J

146.     Plaintiff realleges all other paragraphs as if fully set forth herein.

147.     20 U.S.C. § 1681(a) provides that: No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance.

148.     Mother reported concerns to Mr. Sullivan that Ms. Doe was being intimidated by [STUDENT 1] and his friends and that Ms. Doe was being subjected to frequent harassment and verbal comments doubting her report of her sexual assault and rape by [STUDENT 1].

149.     On or about November 7, 2018, Ms. Doe reported to Mr. Sullivan that she felt like she was being punished by BHS for speaking up and is tired of BHS hurting victims.

150.     In response to these reports, Defendants did not offer to remove [STUDENT 1] from BHS grounds, but instead offered to have Ms. Doe change schools, receive homebound services, or leave classes five to ten minutes early to avoid [STUDENT 1] and other students in the hallways between classes.

151.     Ms. Doe was unable to attend BHS and has had to enroll in homebound services for her academic classes.

152.     This retaliation constitutes a *per se* intentional violation of Title IX under clearly established Supreme Court precedent.

153.     Brighton 27J is not entitled to immunity as it receives federal funding under Title IX, which is conditioned on a clear, unambiguous, and unequivocal waiver thereof. Such waiver does not exist.

154.     Because Brighton 27J's retaliation is an intentional violation of Title IX, Plaintiff is entitled to monetary damages.

155.     Plaintiff is also entitled to attorneys' fees and costs pursuant to 42 U.S.C. § 1988(b), pre-judgment interest, and costs as allowable by federal law.

> **C.     THIRD CLAIM FOR RELIEF: 42 U.S.C. § 1983 – Sex Discrimination in Violation of the Equal Protection Clauses of the Fourteenth Amendment – against Fielder, Gennereux, Smith, Weaver, and Quintanilla, acting in their individual and official capacities**

156.     Plaintiff realleges all other paragraphs as if fully set forth herein.

157.     42 U.S.C. § 1983 provides that: "Every person, who under color of any statute, ordinance, regulation, custom or usage of any state or territory or the District of Columbia subjects or causes to be subjected any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges or immunities secured by the constitution and law shall be liable to the party injured in an action at law, suit in equity, or other appropriate proceeding for redress …."

158.     Plaintiff is a citizen of the United States and Defendants are persons for the purposes of 42 U.S.C. § 1983.

159.     At all relevant times Defendants were acting under the color of state law in their capacities as employees at a public school.

160.      As the alleged conduct occurred during school hours, Defendants' acts were conducted within the scope of their employment.

161.      The Equal Protection Clause requires states to treat an individual in the same manner as others in similar conditions and circumstances.

162.      The hostile environment created by Defendants caused Ms. Doe to withdraw from attending classes at BHS, forced her to enroll in homebound services, and had other adverse effects on her academic performance, thereby depriving her of her protected interest in a right to a public education free from sex-based discrimination and caused her other damages.

163.      The hostile environment created by Defendants was because of Ms. Doe's sex.

164.      Defendants are not entitled to qualified immunity for their alleged acts.

165.      The Complaint alleges in part the deprivation of rights afforded under the Fourteenth Amendment to the United States Constitution, and Title IX, rights are clearly established, as more fully described in *Murrell*, 186 F.3d at 1250-52 (discussing qualified immunity), rights about which Brighton and its agents and employees are acutely aware.

166.      In order for a municipality to be liable for damages, a plaintiff must show that his or her rights were violated pursuant to an official policy of the district or the plaintiff must show that his or her rights were violated by one of the district's final policymakers. *Milligan-Hitt v. Bd. of Trs., Sheridan Cnty. Sch. Dist. No. 2*, 523 F.3d 1219, 1223 (10th Cir. 2008).

167.      As assistant principals, Mr. Smith and Ms. Weaver are final policymakers for the District with respect to discipline of students and investigations of behavioral incidents.

168.      As Superintendent of the District, Mr. Fielder is the final policymaking authority

for the District as it relates to implementing district-wide Title IX processes and procedures.  As Principal, Ms. Genereux was a final policymaker as it relates to implementing Title IX processes and procedures in practice at BHS.

169.     Mr. Fielder, Ms. Genereux, Mr. Smith, and Ms. Weaver, as final policymakers for Brighton 27J and BHS showed deliberate indifference to Ms. Doe's sexual assault and rape and the subsequent harassment and bullying that occurred on a daily basis at BHS.  Their deliberate indifference to sexual harassment that was so severe, pervasive, and objectively offensive that it deprived Ms. Doe of access to educational benefits provided by the school violated Ms. Doe's rights under Title IX.

170.     The final policymakers' deliberate indifference to Ms. Doe's federally protected rights under Title IX was the moving force behind the injury to Ms. Doe, and the final policymakers' actions in violation of the Equal Protection Clause subject Brighton 27J to municipal liability.

171.     As a direct and proximate result of Defendants' conduct, Plaintiff was deprived of her federally-protected individual rights and suffered other damages including severe emotional distress entitling her to compensatory and special damages, in amounts to be determined at trial.

172.     Plaintiff is entitled to attorneys' fees and costs pursuant to 42 U.S.C. § 1988(b), pre-judgment interest, and costs as allowable by federal law.

173.     Plaintiff is also entitled to punitive damages against Defendants pursuant to 42 U.S.C. § 1983 as Defendants acted maliciously, willfully, or with a reckless and wanton disregard for Plaintiff's Constitutional rights.

> D.     **FOURTH CLAIM FOR RELIEF: 42 U.S.C. § 1983 – Deliberate Indifference to Sex Discrimination in Violation of the Equal Protection Clause of the Fourteenth Amendment – against**

**Fielder, Gennereux, Smith, Weaver, and Quintanilla, acting in their individual and official capacities**

174.    Plaintiff realleges all other paragraphs as if fully set forth herein.

175.    42 U.S.C. § 1983 provides that every person, who under color of any statute, ordinance, regulation, custom, or usage of any state or territory or the District of Columbia subjects or causes to be subjected any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and law shall be liable to the party injured in an action at law, suit in equity, or other appropriate proceeding for redress.

176.    Plaintiff is a citizen of the United States and Defendants are persons for purposes of 42 U.S.C. § 1983.

177.    At all relevant times, Defendants were acting under the color of state law in their capacities as employees at a public school, and they were operating within the scope of their employment.

178.    The Equal Protection Clause requires government officials to treat an individual in the same manner as others in similar conditions and circumstances.

179.    "It has been clearly established" in the 10th Circuit "since at least 1992 that a person who exercises a state's supervisory authority may be held liable for consciously acquiescing in sexually harassing conduct by a non-state actor over whom the state actor has authority." *Murrell v. School Dist. No. 1, Denver, Colo.*, 186 F.3d 1238, 1251 (10th Cir. 1999).

180.    "Deliberate indifference to the discriminatory conduct of third parties" on the part of supervisory municipal employees violates the Equal Protection Clause. *Id.*

181.    Plaintiff has a clearly recognized protected interest in her right to an education free from sex-based discrimination.

182.     Plaintiff informed Defendants of the constant intimidation, harassment, and bullying she was experiencing at BHS, and Defendants failed to act appropriately to address it.

183.     On multiple occasions, Ms. Doe and Mother spoke to Defendants about the sex-based discrimination she was experiencing at BHS, and they failed to effectively to protect her from the constant intimidation, harassment, and bullying she was experiencing as a victim of sexual assault and rape.  Rather than protect her, they instead protected the person who sexually assaulted and raped her and another BHS student.

184.      Defendants, as assistant principals, principal, and superintendent, were the appropriate persons for Ms. Doe to approach with her complaints of sex-based harassment and discrimination.

185.     Defendants' inaction led harassment and bullying against Ms. Doe to continue to go unchecked for a prolonged period of time.  Defendants' inaction was part of a pattern of deliberate indifference.

186.     The deliberate indifference by Defendants allowed a hostile school environment to grow and flourish.

187.     The hostile environment, facilitated by Defendants' deliberate indifference to serious sexual misconduct and sexual harassment and bullying, deprived Plaintiff of her recognized interest in her to right to an education free from sex-based discrimination and caused her other damages.

188.     Defendants are not entitled to qualified immunity for their alleged acts and omissions.

189.     The Complaint alleges in part the deprivation of rights afforded under the

Fourteenth Amendment to the United States Constitution, and Title IX, rights are clearly established, as more fully described in *Murrell*, 186 F.3d at 1250-52 (discussing qualified immunity), rights about which Brighton and its agents and employees are acutely aware.

190.     In order for a municipality to be liable for damages, a plaintiff must show that his or her rights were violated pursuant to an official policy of the district or the plaintiff must show that his or her rights were violated by one of the district's final policymakers. *Milligan-Hitt v. Bd. of Trs., Sheridan Cnty. Sch. Dist. No. 2*, 523 F.3d 1219, 1223 (10th Cir. 2008).

191.     As assistant principals, Mr. Smith and Ms. Weaver are final policymakers for the District with respect to discipline of students and investigations of behavioral incidents.

192.     As Superintendent of the District, Mr. Fielder is the final policymaking authority for the District as it relates to implementing district-wide Title IX processes and procedures.  As Principal, Ms. Genereux was a final policymaker as it relates to implementing Title IX processes and procedures in practice at BHS.

193.     Mr. Fielder, Ms. Genereux, Mr. Smith, and Ms. Weaver, as final policymakers for Brighton 27J and BHS showed deliberate indifference to Ms. Doe's sexual assault and rape and the subsequent harassment and bullying that occurred on a daily basis at BHS.  Their deliberate indifference to sexual harassment that was so severe, pervasive, and objectively offensive that it deprived Ms. Doe of access to educational benefits provided by the school violated Ms. Doe's rights under Title IX.

194.     The final policymaker's deliberate indifference to Ms. Doe's federally protected rights under Title IX was the moving force behind the injury to Ms. Doe, and the final policymakers' actions in violation of the Equal Protection Clause subject Brighton 27J to municipal liability.

195.     As a direct and proximate result of Defendants' conduct, Plaintiff was deprived of her Constitutional rights and suffered other damages including severe emotional distress entitling her to compensatory and special damages, in amounts to be determined at trial.

196.     Plaintiff is entitled to attorneys' fees and costs pursuant to 42 U.S.C. § 1988(b), pre-judgment interest, and costs as allowable by federal law.

197.     Plaintiff is also entitled to punitive damages against Defendants pursuant to 42 U.S.C. § 1983 as Defendants acted maliciously, willfully, or with a reckless and wanton disregard for Plaintiff's Constitutional rights.

### E.     FIFTH CLAIM FOR RELIEF
### (DECLARATORY AND INJUNCTIVE RELIEF)

198.     Plaintiff realleges all other paragraphs as if fully set forth herein.

199.     This is a civil rights suit in part requesting declaratory relief and injunctive relief pursuant to 42 U.S.C. § 1983 and 28 U.S.C. §§ 2201-2202 brought by Ms. Doe to enjoin the discriminatory conduct alleged above on behalf of herself and all other Brighton 27J students.

200.     The parties have an actual dispute regarding whether Brighton 27J and its agents and/or employees violated Ms. Doe's constitutionally protected right to an education free from sex-based discrimination as well as whether Brighton 27J, through final policymakers' actions, has a policy of Title IX noncompliance.

201.     WHEREFORE, Plaintiff Ms. Doe requests declaratory judgment enter in her favor and against the Defendants that: Defendants' rules, regulations, policies, and procedures are unconstitutional and void; and Defendants have under color of law deprived her of her rights, privileges, and immunities as guaranteed by the Constitution and Laws of the United States.

202.     Plaintiff Ms. Doe further requests that the Court: (1) issue a temporary restraining

order and a preliminary injunction pursuant to F.R.C.P. 65, ordering Defendants, their officers, agents, employees, successors, attorneys, and all those in active concert or participation with them to refrain immediately and pending the final hearing and determination of this action from discriminatory conduct; (2) issue a permanent injunction perpetually enjoining and restraining Defendants, their officers, agents, employees, successors, attorneys, and all those in active concert or participation with them, of the conduct complained; (3) award to Ms. Doe costs and disbursements, as well as reasonable attorney's fees; and (4) award Ms. Doe such other and further relief as this Court may deem proper, including but not limited to requiring Defendants to effect proper training to prevent the recurrence of such conduct in their hiring, firing, training and educational policies and procedures.

203.     WHEREFORE, Plaintiff Ms. Doe requests that judgment enter in her favor and against the Defendants jointly and severally, in an amount to be determined by a judge or jury and that the Court also award the Plaintiff her legal fees and costs incurred in pursuing this action.

## VI.     DAMAGES

204.     The Defendants' discriminatory and retaliatory conduct alleged hereinabove has caused the Plaintiff the following damages:

   a.   Lost front pay, future wages, and benefits in amounts to be established at trial;

   b.   Emotional upset, stress, and anxiety in an amount to be established at trial;

   c.   Out-of-pocket expenses, litigation costs, and attorney fees in amounts to be established at trial.

205.     Defendants' violations of Title IX and the Equal Protection Clause were willful, entitling the plaintiff to an award of punitive damages to the fullest extent permitted by law.

## VII.     REQUEST FOR RELIEF

Plaintiff requests that the court enter judgment in her favor and against Defendant as follows:

206.     Awarding the Plaintiff's special damages for front lost wages, benefits, and out-of-pocket expenses in amounts to be established at trial;

207.     Awarding the Plaintiff general damages for emotional distress in an amount to be established at trial;

208.     Punitive damages, pursuant to 42 U.S.C. § 1981, 2000(e), in the maximum amount permitted by law;

209.     Awarding the Plaintiff statutory and reasonable attorney fees, litigation expenses, and costs incurred in this action;

210.     Awarding Plaintiff pre-judgment interest; and

211.     Awarding the Plaintiff any additional and further relief that the court finds equitable, appropriate, or just.

---

*PLAINTIFF REQUESTS A JURY ON ALL ISSUES SO TRIABLE*

---

*/s/* Igor Raykin
Igor Raykin, Esq.
Kishinevsky & Raykin, Attorneys at Law
2851 South Parker Road, Suite 150
Aurora, CO 80014
Telephone: (720) 767-1846
E-mail: igor@coloradolawteam.com
Attorney for Plaintiff

*/s/ Michael Nolt*
Michael Nolt, Esq., Atty. Reg. # 50668
Kishinevsky & Raykin, Attorneys at Law
2851 S. Parker Rd., Ste. 150
Aurora, CO 80014

Phone: 720-588-9713
michael@coloradolawteam.com