**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Judge William J. Martínez**

Civil Action No. 19-cv-0950-WJM-NRN

JANE DOE, through her mother and next friend Megan Doe,

     Plaintiff,

v.

BRIGHTON SCHOOL DISTRICT 27J;
CHRIS FIELDER, individually, and in his official capacity as superintendent of Brighton 27J School District;
SHELLY GENEREUX, individually, and in her official capacity as a principal with Brighton 27J School District;
DAVID SMITH, individually, and in his official capacity as an assistant principal with Brighton 27J School District;
JANELLE WEAVER, individually, and in her official capacity as an assistant principal with Brighton 27J School District; and
DESIREE QUINTANILLA, individually, and in her official capacity as an Intervention Specialist with Brighton 27J,

     Defendants.

_____

**ORDER GRANTING IN PART AND DENYING IN PART
DEFENDANTS' MOTION TO DISMISS**
_____

On April 1, 2019, Plaintiff Jane Doe, through her mother and next friend Megan

Doe ("Plaintiff's Mother"), filed the instant action asserting claims under Title IX of the

Educational Amendments of 1972, 20 U.S.C. §§ 1681 *et seq.* ("Title IX"), against

Defendant Brighton School District 27J (the "District"), as well as equal protection

claims for sex discrimination and deliberate indifference to sex discrimination under 42

U.S.C. § 1983 against Defendants Chris Fiedler, Shelly Genereux, David Smith, Janelle

Weaver, and Desiree Quintanilla (together, "Individual Defendants") in their individual

and official capacities.  (ECF No. 15.)  Plaintiff also seeks declaratory and injunctive

relief.  (*Id.* ¶¶ 198–203.)

Before the Court is Defendants' Motion to Dismiss (the "Motion").  (ECF No. 28.)
For the reasons explained below, the Motion is granted in part and denied in part.

## I. BACKGROUND

The Court accepts the following facts as true for purposes of the Motion.  At the
time of the events giving rise to this action, Plaintiff attended Brighton High School
("BHS"), which is part of the District.  (ECF No. 15 ¶ 8.)  On September 17, 2018,
Plaintiff was sexually assaulted and raped by a fellow BHS student, "Student 1," at
Plaintiff's residence.  (*Id.* ¶ 9.)  Thereafter, Student 1 engaged in unlawful sexual
contact against Plaintiff, by groping her and putting his hands on her body despite her
protestations, on BHS property.  (*Id.* ¶¶ 10–11.)

On Tuesday, October 30, 2018, Detective Lara-Rush at the Adams County
Sheriff's Department informed Plaintiff's Mother that Student 1 had sexually assaulted
Plaintiff.[1]  (*Id.* ¶ 12.)  Det. Rush also told Plaintiff's Mother that Student 1 had engaged
in unlawful sexual contact with another BHS student ("Student 2") in May 2018, and that
she had informed BHS officials about that assault on May 10, 2018.  (*Id.* ¶¶ 13–15.)
Det. Rush advised Plaintiff's Mother that she would inform BHS officials of Student 1's
sexual assault and rape of Plaintiff.  (*Id.* ¶ 17.)

On Wednesday, October 31, 2018, BHS counselor Ryan Sullivan called
Plaintiff's Mother to inform her that Plaintiff was "not being herself and seemed very

---

[1] Plaintiff refers to the detective as "Lara-Rush" or "Ms. Rush," while Defendants refer to
her as "Rush-Lara."  (ECF No. 15 ¶ 12; ECF No. 28 at 3.)  The Court will refer to her as "Det.
Rush."

troubled." (*Id.* ¶ 22.)  Plaintiff's Mother told Sullivan that something horrific had happened to Plaintiff but did not share the details with him.  (*Id.* ¶ 23.)

On Thursday, November 1, 2018, Det. Rush told BHS assistant principal Smith that Student 1 "had sexually assaulted [Plaintiff]."  (*Id.* ¶ 18.)  Det. Rush also recommended that Student 1 be segregated from Plaintiff and that BHS establish a safety plan for Plaintiff because she and Student 1 could not be in the same class. Finally, Det. Rush told Smith that Plaintiff was the second person who Student 1 had sexually assaulted.  (*Id.* ¶ 19.)

On Friday, November 2, 2018, Det. Rush called Plaintiff and Plaintiff's Mother to schedule a forensic interview.  (*Id.* ¶ 24.)  On Monday, November 5, 2018, the forensic interview took place at Ralston House, an organization that works with child victims of abuse.  (*Id.* ¶ 25.)

On November 6, 2018, Plaintiff's Mother made an appointment for Plaintiff to see a counselor.  (*Id.* ¶ 29.)  Plaintiff's Mother also spoke with Sullivan, and told him about the sexual assault and rape.  (*Id.* ¶ 30.)  She asked counselor Sullivan about Plaintiff's options, given that Plaintiff's "mental and emotion health had deteriorated such that she could no longer force herself to go to school."  (*Id.* ¶ 31.)  She also questioned why Student 1 was still attending BHS.  (*Id.* ¶ 32.)  Sullivan told Plaintiff's Mother that Plaintiff had three options: change schools, leave class several minutes early to avoid other students in the hallways, or use homebound services.  (*Id.* ¶ 33.)

Plaintiff's Mother seemingly spoke with Sullivan again that evening.  (*Id.* ¶ 35.) She informed Sullivan that Student 1 now appeared everywhere Plaintiff would go in

school, that Student 1 was intimidating Plaintiff, and that Student 1's friends were talking loudly at BHS and commenting that Plaintiff was trying to ruin Student 1''s life. (*Id.* ¶¶ 37–39.)  Plaintiff's Mother told Sullivan that the comments occurred frequently and caused Plaintiff such stress that she came home from BHS in hives.  (*Id.* ¶ 40.)

Also on November 6, Plaintiff's Mother contacted intervention specialist Quintanilla, and left a voicemail asking for Quintanilla to return her call.  (*Id.* ¶ 34.)  On November 7, Plaintiff's Mother called Quintanilla again, and left another voicemail asking Quintanilla to return her call because Plaintiff was being intimidated by Student 1 and his friends.  (*Id.* ¶ 45.)

Also on November 7, Plaintiff talked to Sullivan and told him that she "felt that she was being punished for speaking up and that she [was] tired of the school because it hurts victims."  (*Id.* ¶ 44.)  Sullivan again contacted Plaintiff's Mother to inform her that he could not remove Student 1 from BHS.  After Plaintiff came home from school, Plaintiff's Mother wrote Sullivan an e-mail to inform him that Plaintiff "came home a complete mess over this situation and with hearing more and more rumors.'"  (*Id.* ¶ 58.)  She stated that Plaintiff was "a mental mess," physically ill as a result, and that BHS made Plaintiff feel as if she had done something wrong.  (*Id.* ¶ 59.)

That same day, Plaintiff's Mother e-mailed Smith to inform him that the school was "making a victim feel like a predator," that Plaintiff could not "handle any more stress," and that BHS was "causing permanent harm."  (*Id.* ¶ 60.)

That same day, Plaintiff's Mother contacted BHS's other assistant principal, Weaver.  (*Id.* ¶ 42).  Plaintiff's Mother left two voicemails for Weaver, who called her

back later that day.  (*Id.* ¶¶ 42, 52.)  When Plaintiff's Mother spoke with Weaver, she informed her of the sexual assault and rape of Plaintiff, and Plaintiff's subsequent experience of intimidation by Student 1 and his friends at BHS.  (*Id.* ¶ 52.)  Plaintiff's Mother also told Weaver that Plaintiff "wanted to die."  (*Id.*)  Weaver offered the same options that Sullivan had: moving schools, leaving class early to avoid other students, or receiving homebound services.  (*Id.* ¶ 53.)  Weaver did not offer or suggest any way to prevent Student 1 from contacting Plaintiff.  (*Id.*)  Plaintiff's Mother expressed concern that Student 1 remained at BHS, and that no steps had been taken to discipline him or prevent him from contacting Plaintiff.  (*Id.* ¶ 55.)  In response, Weaver told Plaintiff's Mother that Student 1 "had just as much of a right to be at BHS as [Plaintiff] had," and that Weaver could not do anything until criminal charges were filed against Student 1.  (*Id.* ¶¶ 56–57.)

Also on November 7, Plaintiff's Mother contacted District personnel.  She called District superintendent Fiedler, and left a detailed message about the assault and subsequent harassment with the receptionist.  (*Id.* ¶ 47.)  She also left a voicemail for the District's Director of Student Achievement and Professional Learning, Dr. Richard Patterson, which described the sexual assault, subsequent events at BHS, Plaintiff's deteriorating mental health, Plaintiff's Mother's attempts at discussing the events with BHS officials, and the inadequacy of the options provided by BHS.  (*Id.* ¶ 48.)

Plaintiff also alleges on information and belief that principal Genereux "would have been informed of [Student 1's] prior sexual assault of a BHS student in May 2018, [Student 1's] sexual assault and rape of [Plaintiff], and the intimidation and harassment

[Plaintiff] has been experiencing daily at BHS" and would have "communicated about these events with BHS assistant principals, Mr. Smith and Ms. Weaver." (*Id.* ¶ 114.)

On November 8, Dr. Patterson returned Plaintiff's Mother's phone call and informed her that Quintanilla would handle the situation. (*Id.* ¶ 63.) That same day, Quintanilla returned Plaintiff's Mother's calls. Plaintiff's Mother described Student 1's sexual assault and rape of Plaintiff, as well as Plaintiff's deteriorating mental and emotional health. (*Id.* ¶ 61.) Quintanilla initially told Plaintiff's Mother that Student 1 could not be kicked out of school, but later informed her that Student 1 had been suspended from BHS for five days. (*Id.* ¶¶ 62, 64.)

On November 9, Plaintiff saw a new counselor, who determined that Plaintiff had suffered "extensive emotional and mental damage from the sexual assault and rape as well as from her experiences at BHS." (*Id.* ¶ 65.) The counselor recommended Plaintiff see a doctor to get a prescription for anti-depression medication. (*Id.* ¶ 66.)

Also on November 9, Smith called Plaintiff's Mother to inform her that Weaver was working on a plan for Plaintiff's academics. (*Id.* ¶ 67.) At that time, Plaintiff's Mother told Smith that Plaintiff had been intimidated at BHS and that BHS had not done enough to protect Plaintiff from bullying and intimidation by Student 1 and his friends. (*Id.* ¶ 68.) Smith claimed that he was unaware of the bullying. (*Id.*)

Later that day, Weaver and Quintanilla called Plaintiff's Mother, who expressed concern about the fallout from Student 1's suspension and Plaintiff's deteriorating mental health. (*Id.* ¶¶ 70–71.) Weaver and Quintanilla did not answer questions about Student 1's return to school and BHS's plan to address bullying. (*Id.* ¶¶ 70, 72.) They

also apparently refused Plaintiff's Mother's request for a 504 Plan or Individualized Education Plan ("IEP").  (*Id.* ¶ 69.)

After that phone call, Plaintiff, Plaintiff's Mother, Weaver, Quintanilla, and Smith met to discuss the sexual assault and ensuing bullying and harassment.  (*Id.* ¶ 93.) They discussed that Student 1's friends had followed Plaintiff around BHS claiming that Plaintiff was trying to ruin Student 1's life with lies, and that a student had also called Plaintiff a whore or slut in the hallway.  (*Id.* ¶¶ 74–75.)  Plaintiff's Mother also told Weaver, Quintanilla, and Smith that Plaintiff's mental health had been impacted by the assault and subsequent bullying.  She again asked for BHS to evaluate Plaintiff for additional services, such as a 504 Plan or IEP.  (*Id.* ¶ 80, 82.)  Smith, Weaver, and Quintanilla rejected the idea of evaluating Plaintiff for a 504 Plan or IEP beause "she was in crisis and the evaluation would be skewed."  (*Id.* ¶ 82.)

On December 4, Student 1 returned to BHS, despite still being suspended, and remained on campus for several hours.  (*Id.* ¶ 83.)  Presumably, Student 1's five-day suspension beginning November 8 was extended through at least December 4. Apparently due to a miscommunication between BHS and Student 1, he erroneously believed that he could return to BHS.  (*Id.* ¶ 96.)  Plaintiff's Mother called Weaver to report that Student 1's new car had been on the BHS campus "multiple times" (although Plaintiff had only recently learned that the car belonged to Student 1), and that Student 1 had "been on BHS grounds for lunch with his friends every day."  (*Id.* ¶ 88.)  She also reported an incident in which another student, "Student 3," repeatedly asked Plaintiff about Student 1 during a math class and the math teacher did not immediately stop

Student 3's harassment of Plaintiff.  (*Id.* ¶ 86.)

On December 5, Plaintiff's Mother spoke to Weaver and Smith and relayed that Plaintiff had a 47-minute panic attack when she saw Student 1's friends gather around his car on campus.  (*Id.* ¶ 91.)  Weaver and Smith told her that security had been informed about the vehicle and was prepared to cite Student 1 for trespassing, provided that BHS officials were informed next time the vehicle was on campus.  (*Id.* ¶ 93.)

On December 6, Plaintiff's Mother expressed to Quintanilla her frustration at BHS's lack of response to the sexual assault and subsequent bullying, particularly because BHS had "no protection in place for [Plaintiff]."  (Id. ¶ 94.)  Quintanilla explained the difficulty of ensuring that Student 1 would not come to BHS, and stated that the only way to ensure Plaintiff did not encounter Student 1 would be for Plaintiff to not come to BHS.  (*Id.* ¶ 97.)

Plaintiff continued to have panic attacks and suffer from depression in January and February 2019.  (*Id.* ¶¶ 102–13.)  On January 8, Plaintiff's Mother reported to Weaver that the verbal harassment continued both at BHS and on social media.  On February 9, Plaintiff's Mother reported to Det. Rush that Student 1's girlfriend, "Student 4," messaged Plaintiff on Instagram, asked "what did you want to gain from accusing [Student 1] of all the things you did," accused Plaintiff of lying and seeking attention, and stated "I hope no one ever forgives you."  (*Id.* ¶¶ 105–08.)  As a result of those messages, Plaintiff attempted suicide.  (*Id.* ¶ 109.)  BHS required Student 4 to sign a contract stating that she would not contact Plaintiff again.  (*Id.* ¶ 110.)

Since reporting the sexual assault and rape, Plaintiff felt exiled from school

because of the resulting harassment, and was unable to return to BHS.  (*Id.* ¶¶ 112–13.)  Plaintiff has instead enrolled in homebound services to complete her school work.  (*Id.* ¶ 113.)

## II. LEGAL STANDARD

Under Federal Rule of Civil Procedure 12(b)(6), a party may move to dismiss a claim in a complaint for "failure to state a claim upon which relief can be granted."  The Rule 12(b)(6) standard requires the Court to "assume the truth of the plaintiff's well-pleaded factual allegations and view them in the light most favorable to the plaintiff."  *Ridge at Red Hawk, LLC v. Schneider*, 493 F.3d 1174, 1177 (10th Cir. 2007).  In ruling on such a motion, the dispositive inquiry is "whether the complaint contains 'enough facts to state a claim to relief that is plausible on its face.'"  *Id.* (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  Granting a motion to dismiss "is a harsh remedy which must be cautiously studied, not only to effectuate the spirit of the liberal rules of pleading but also to protect the interests of justice."  *Dias v. City & Cnty. of Denver*, 567 F.3d 1169, 1178 (10th Cir. 2009) (internal quotation marks omitted).  "Thus, 'a well-pleaded complaint may proceed even if it strikes a savvy judge that actual proof of those facts is improbable, and that a recovery is very remote and unlikely.'"  *Id.* (quoting *Twombly*, 550 U.S. at 556).

## III. ANALYSIS

### A.     Title IX Deliberate Indifference to Sexual Harassment (Claim 1)

Title IX states that, with limited exceptions not relevant here, "[n]o person in the United States shall, on the basis of sex, be excluded from participation in, be denied the

benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance." 20 U.S.C. § 1681. Plaintiff alleges that the District receives federal funding. (ECF No. 15 ¶ 153.) A recipient "of federal funds may be liable under Title IX for its own conduct in being deliberately indifferent to student-on-student harassment." *Rost ex rel. K.C. v. Steamboat Springs RE-2 Sch. Dist.*, 511 F.3d 1114, 1119 (10th Cir. 2008). A school district is liable under Title IX if it "(1) has actual knowledge of, and (2) is deliberately indifferent to, (3) harassment that is so severe, pervasive and objectively offensive as to (4) deprive access to the educational benefits or opportunities provided by the school." *Id.*; *see also Davis v. Monroe Cnty. Bd. of Educ.*, 529 U.S. 629, 650 (1999).

Defendants argue that Plaintiff has not plausibly alleged that an "appropriate person" had actual knowledge of discrimination before November 7, 2018; that any specific harassment was "severe, pervasive, and objectively offensive"; or that district officials were deliberately indifferent at the point that they had actual knowledge of the harassment. (ECF No. 28 at 7–14.)

    1.   Actual Knowledge of Harassment

A recipient of federal funds is liable only if an "appropriate person"—who "at a minimum has authority to address the alleged discrimination and to institute corrective measures on the recipient's behalf"—knows of the harassment. *Gebser v. Lago Vista Indep. Sch. Dist.*, 524 U.S. 274, 290 (1998); *see BPS v. Bd. of Trs. for Colo. Sch. for the Deaf & Blind*, 2015 WL 5444311, at *11 (D. Colo. Sept. 16, 2015).

Defendants argue that no appropriate person had actual knowledge of the

harassment until November 7, 2018, when Plaintiff's Mother reported the harassment to Smith and Weaver. (ECF No. 28 at 7–9.) In particular, Defendants contend that Det. Rush's conversation with Smith on November 1, 2018, did not give an appropriate person knowledge of harassment because it addressed only the off-campus assault. (*Id.* at 9.) Defendants further argue that the report to Sullivan on November 6, 2018, was inadequate because Sullivan is not an "appropriate person" under Title IX. (*Id.* at 8.)

Defendants narrowly read Plaintiff's allegations of the report to Smith, and claim that the "Complaint alleges Mr. Smith knew by November 1, 2018 that Plaintiff had been assaulted off-campus." (ECF No. 28 at 9.) This reading is not supported by the text of the Complaint.

According to the Complaint, on November 1, 2018, Rush informed Smith that Student 1 "had sexually assaulted [Plaintiff]," and recommended that BHS segregate Student 1 from Plaintiff and put a safety plan in place for Plaintiff. (ECF No. 15 ¶¶ 18, 20.) The Complaint does not clarify whether Det. Rush informed Smith of the off-campus sexual assault and rape on September 17, 2018, or the other instances of on-campus sexual assaults during which Student 1 "groped [Plaintiff], and he put his hands on her body despite [Plaintiff] telling him to stop." (*See id.* ¶¶ 9–11.) Viewing the well-pleaded allegations in the light most favorable to Plaintiff, Plaintiff has alleged that assistant principal Smith knew about Student 1's on-campus sexual assault of Plaintiff as of November 1, 2018.[2] While Defendants may be able to demonstrate at a later

---

[2] Because Plaintiff has plausibly alleged that Smith knew of the on-campus sexual assaults as of November 1, the Court need not resolve whether the off-campus rape, and

stage of this case that, on November 1, 2018, Det. Rush only informed Smith about the off-campus rape, Plaintiff has made plausible allegations in the Complaint that Smith, who is undisputedly an "appropriate person" in the context of this legal claim, had actual knowledge of the on-campus sexual assault as of November 1, 2018. (*See id.* ¶¶ 18, 20, 135.)

Because the Court concludes that Plaintiff has adequately alleged that an "appropriate person" had actual knowledge of the on-campus sexual assault as of November 1, 2018, the Court need not address at this time whether Sullivan is an "appropriate person" under Title IX.

2.    Severe, Pervasive, and Objectively Offensive Harassment

Defendants argue that the verbal harassment endured by Plaintiff after she reported the rape and sexual assault does not rise to the level of "severe, pervasive, and objectively offensive conduct" required to state a Title IX claim. (ECF No. 28 at 9–11.) In response, Plaintiff argues that "allegations of bullying, harassment, intimidation, and name-calling of Plaintiff . . . occur[ring] within the context of a sexual assault and rape of Plaintiff . . . takes Plaintiff's allegations out of the realm of generalized bullying and into the realm of prohibited sexual harassment." (ECF No. 33 at 6.)

"To be severe, pervasive, and objectively offensive, the behavior must be serious

_____

knowledge thereof, is a basis for imposing liability under Title IX. *See Rost*, 511 F.3d at 1121 (explaining that "merely because the principal thought that the school could discipline students for conduct occurring outside the school grounds says nothing about whether it was appropriate given what occurred here . . . . This is not a situation where a school district learned of a problem and did nothing").

enough to have a 'systemic effect' of denying equal access to an education." *BPS*, 2015 WL 5444311, at \*13. Multiple instances of sexual assault are "severe, pervasive, and objectively offensive" harassment. *See Murrell v. Sch. Dist. No. 1, Denver, Colo.*, 186 F.3d 1238, 1248 (10th Cir. 1999). In addition, a "single, serious sexual assault can meet the severe, pervasive, and offensive standard." *Doe 1 v. Howard Univ.*, 396 F. Supp. 3d 126, 136 n.2 (D.D.C. 2019). For example, in *Farmer*, the defendant did not contest that the sexual harassment—in that case, rape—suffered by the plaintiffs was "sufficiently extreme" to be severe, pervasive and objectively offensive. *Farmer v. Kan. State Univ.*, 918 F.3d 1094, 1104 n.4 (10th Cir. 2019). Moreover, a single instance of severe, sexual abuse of a plaintiff coupled with a defendant's "pervasive deliberate indifference" may also constitute a "severe, pervasive, and objectively offensive environment." *BPS*, 2015 WL 5444311, at \*14.

Plaintiff alleges that she was raped by Student 1, sexually assaulted on-campus by Student 1, and subjected to verbal harassment as a result of reporting the rape and sexual assault. (ECF No. 15 ¶¶ 9–11, 37–41, 45–46, 53, 59–60.) The Court holds that allegations of on-campus sexual assaults, combined with the harassment from peers after reporting the assaults and rape, and further combined with Defendants' failure to take action when first reported, are sufficient to allege severe, pervasive, and objectively offensive harassment under Title IX. *See Murell*, 186 F.3d at 1248; *Farmer*, 918 F.3d at 1104 n.4; *BPS*, 2015 WL 5444311, at \*14. The Court notes that Plaintiff will likely need evidence or further details regarding the on-campus sexual assaults and harassment to survive a motion for summary judgment. However, at this stage of the

litigation, Plaintiff has plausibly alleged severe, pervasive, and objectively offensive harassment that effectively denied her equal access to an education.

      3.    <u>Deliberate Indifference</u>

"Once a funding recipient . . . has actual knowledge of sexual harassment that is severe, pervasive and objectively offensive . . . , the recipient cannot, acting with deliberate indifference, turn a blind eye to that harassment." *Farmer*, 918 F.3d at 1104. In the Tenth Circuit, a plaintiff is not required to prove further sexual harassment after reporting. *Id.* Instead, a plaintiff must allege that the defendant's deliberate indifference "cause[d] students to undergo harassment or ma[d]e them liable or vulnerable to it." *Farmer*, 918 F.3d at 1104. *But see Kollaritsch v. Michigan State Univ. Bd. of Trustees*, 944 F.3d 613, 628 (6th Cir. 2019) (Thapar, J., concurring) (adopting a narrower reading of *Davis*, and requiring that a student "allege that the school's deliberate indifference actually led to harassment, not that it only made such harassment more likely"); *Karasek v. Regents of the Univ. of Cal.*, 2020 WL 486786, at *8 n.2 (9th Cir. Jan. 30, 2020) (noting the circuit split between the Sixth and Tenth Circuits).

In *Farmer*, the Tenth Circuit held that the plaintiffs sufficiently pled that the university's "deliberate indifference to their reports of rape made them vulnerable to harassment by alleging that the fear of running into their student-rapists caused them" to change their behavior on campus. 918 F.3d at 1104–05. The Tenth Circuit concluded that the plaintiffs had alleged "more than a general fear of running into their assailants" because they alleged "that their fears have forced them to take very specific

actions that deprived them of the educational opportunities offered to other students."
*Id.* at 1105. The court further explained that a "Title IX plaintiff's alleged fear of
encountering her attacker must be objectively reasonable, but under the horrific
circumstances alleged here Plaintiffs have adequately alleged that [the university's]
deliberate indifference to their rape reports reasonably deprived them of educational
opportunities available to other students." *Id.* In the Court's view, the *Farmer* decision
is better-reasoned and legally sounder that the Sixth Circuit's approach to this issue,
and it will follow the *Farmer* court's lead on the pleading standard to apply in these
circumstances.

Here, Plaintiff alleges that after Smith knew of the sexual assault on November 1
and before BHS or the District took any action starting November 8, Student 1
intimidated her on campus, began to appear "everywhere [she] would go in school," and
that Student 1's friends and other students were directing hostile verbal comments
toward Plaintiff and otherwise intimidating her. (ECF No. 15 ¶¶ 37–41.) For example,
Plaintiff alleges that Student 1's friends were "talking loudly at BHS, saying that
[Plaintiff] and girls were trying to ruin [Student 1's] life." (*Id.* ¶ 39.) As a result, Plaintiff
suffered "such severe stress that she came home from BHS in hives." (*Id.* ¶ 40.)
Plaintiff's Mother also noted that Plaintiff's "mental and emotional health had
deteriorated such that she could no longer force herself to go to school." (*Id.* ¶ 31.)

The Court finds that Plaintiff has plausibly alleged an objectively reasonable fear
of encountering Student 1, and that BHS's deliberate indifference to the November 1
report of sexual assault made to an assistant principal deprived Plaintiff, for at least a

week, of educational opportunities available to other students.  *See Farmer*, 918 F.3d at 1105; *Doe v. Sch. Dist. No. 1, Denver, Colo.* ("*Sch. Dist. No. 1 2020*"), 2020 WL 209854, at *4 (D. Colo. Jan. 14, 2020) (finding that a supervising teacher's delay in reporting sexual assault did not amount to deliberate indifference where there was no allegation that the plaintiff experienced additional harassment during the period of delay).  Plaintiff has therefore stated a Title IX claim for deliberate indifference to sexual harassment against the District.  Accordingly, the Court denies Defendants' Motion as to this claim.

**B.  Title IX Retaliation (Claim 2)**

The Supreme Court has recognized that "[r]etaliation against a person because that person has complained of sex discrimination is another form of intentional sex discrimination encompassed by Title IX's private cause of action."  *Jackson v. Birmingham Bd. of Educ.*, 544 U.S. 167, 173 (2005).  To prove a retaliation claim, a plaintiff is required to establish that she suffered adverse action because of her protected activity.  *Berry v. Mission Grp. Kansas, Inc.*, 463 F. App'x 759, 766 (10th Cir. 2012).  When a plaintiff cannot directly establish retaliation, she may instead rely on the three-step, burden shifting framework established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802–04 (1973).  *See Hiatt v. Colo. Seminary*, 858 F.3d 1307, 1315 n.8 (10th Cir. 2017) ("Title VII is the most appropriate analogue when defining Title IX's substantive standards" (internal quotation marks omitted)); *Berry*, 463 F. App'x at 766 & n.7.

Under the *McDonnell Douglas* three-step analysis, a plaintiff must first set forth a

prima facie case of retaliation. *Hiatt*, 858 F.3d at 1316. If plaintiff establishes a prima facie case, the burden shifts to defendant to articulate a legitimate, non-discriminatory basis for its employment decision. *Id.* If the defendant does so, the inference of discrimination drops out and the burden shifts back to the plaintiff to show that defendant's proffered reason is pretextual. *Id.*

Plaintiff and Defendants both cite the standard used in *Tackett v. University of Kansas* for the elements of a Title IX retaliation claim:

> To state a claim for retaliation under Title IX, a plaintiff must allege that: 1) he or she engaged in protected activity; 2) defendant had knowledge of the protected activity; 3) materially adverse school-related action was taken against plaintiff; and 4) there was a causal connection between the protected activity and the adverse action.

234 F. Supp. 3d 1100, 1109 (D. Kan. 2017); *see also Doe v. Sch. Dist. No. 1, Denver, Colo.* ("*Sch. Dist. No. 1 2019*"), 2019 WL 3425236, at *6 (D. Colo. July 30, 2019) (using *Tackett* standard); *Higgins v. Saavedra*, 2018 WL 327241, at *9 (D.N.M. Jan. 8, 2018) (same).

The *Tackett* standard, however, states only the elements of a prima facie case of Title IX retaliation. *See Nave v. Indep. Sch. Dist. No. 20 of LeFlore Cty.*, 2018 WL 6419296, at *6 (E.D. Okla. Dec. 6, 2018) (describing the same elements in *Tackett* as the elements of a prima facie case of Title IX retaliation). Because the Tenth Circuit has endorsed the *McDonnell Douglas* standard for Title IX retaliation claims, the Court will consider the *Tackett* standard with respect to the elements of a prima facie case, which is the first element of the burden-shifting analysis for Title IX retaliation under *McDonnell Douglas* framework.

17

Defendants essentially argue that Plaintiff fails to allege a prima facie case of Title IX retaliation because she fails to allege (1) a materially adverse school-related action, or (2) any causal connection between Plaintiff's protected activity and the adverse action that would support a finding of retaliatory animus. (ECF No. 28 at 14–15; ECF No. 34 at 7.) Plaintiff responds that "within a short time period from raising complaints . . . Defendants suggested that Plaintiff, the victim, leave school instead of the perpetrator and refused Mother's requests to evaluate Plaintiff for an IEP or 504 plan." (ECF No. 33 at 12.) Defendants claim that Plaintiff's allegation regarding the IEP and 504 Plan "does not appear in her Complaint." (ECF No. 34 at 7–8.) While the allegations of retaliation do not appear in the section titled "Second Claim for Relief . . . Retaliation in Violation of Title IX," Plaintiff alleges elsewhere in the Complaint that she requested an IEP and 504 Plan after she reported the sexual assault and harassment to BHS, and that her request was denied shortly thereafter. (ECF No. 15 ¶¶ 69, 80–82.)

Plaintiff therefore alleges a materially adverse, school-related action. Plaintiff's Mother asked BHS to evaluate Plaintiff for an IEP or 504 Plan so that Plaintiff could access additional services, given the state of Plaintiff's mental health. (*Id.* ¶¶ 80–81.) BHS denied the request. (*Id.* ¶ 82.) Under the circumstances, BHS's denial of a request to perform an evaluation of Plaintiff for an IEP or 504 Plan was a materially adverse, school-related action. On this record, however, the Court has no reasonable basis from which it can infer that Defendants' suggestion that Plaintiff leave school, among other options presented to Plaintiff, is itself a separate and distinct materially adverse action. *See Sch. Dist. No. 1 2019*, 2019 WL 3425236, at *6.

18

The Court thus considers whether there is a causal connection between Plaintiff's protected activity (complaining of sexual harassment) and the adverse action (denying Plaintiff an evaluation for an IEP or 504 Plan). *See Tackett*, 234 F. Supp. 3d at 1106. "To establish a causal connection, a plaintiff must present evidence of circumstances that justify an inference of retaliatory motive." *Laul v. Los Alamos Nat'l Labs.*, 765 F. App'x 434, 441–42 (10th Cir. 2019) (internal quotation marks omitted) (Title VII retaliation). "If the protected conduct is closely followed by the adverse action, courts have often inferred a causal connection." *Bekkem v. Wilkie*, 915 F.3d 1258, 1271 (10th Cir. 2019) (observing that a reprimand on the same day a plaintiff engaged in protected activity is sufficient to establish a prima facie case of retaliation); *see also Higgens*, 2018 WL 327241, at *10.[3]

Plaintiff has alleged that she was denied an IEP or 504 Plan evaluation within several days of reporting the sexual assault and sexual harassment to BHS. The Court finds that the close temporal connection between Plaintiff's protected activity and the subsequent adverse action undertaken by BHS is sufficient to support an inference of causation. *See Bekkem*, 915 F.3d at 1271. Plaintiff has therefore stated a prima facie case of Title IX retaliation.

The burden therefore shifts under *McDonnell Douglas* to Defendants to articulate a legitimate, non-retaliatory reason for the adverse action. Defendants have utterly

_____

[3] No party addresses whether a Title IX retaliation claim, like a Title VII retaliation claim requires proof that "the desire to retaliate was the but-for cause of the challenged . . . action." *Univ. of Texas Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 352 (2013). However, the Court finds that even if the higher burden of but-for causation applies, Plaintiff has sufficiently alleged a causal connection.

failed to do so.  The Court therefore has before it a plausibly alleged and unrebutted prima facie case of Title IX retaliation.  As a consequence, Defendants' Motion is denied as to the Title IX retaliation claim.

**C.    42 U.S.C. § 1983 Equal Protection—Deliberate Indifference to Sexual Harassment (Claim 4)**

1.    <u>Individual Capacity Claims</u>

"Qualified immunity shields federal and state officials from money damages unless a plaintiff pleads facts showing (1) that the official violated a statutory or constitutional right, and (2) that the right was 'clearly established' at the time of the challenged conduct." *Ashcroft v. al-Kidd*, 563 U.S. 731, 735 (2011).  When a defendant asserts the defense of qualified immunity, the burden shifts to the plaintiff to overcome the asserted immunity.  *Riggins v. Goodman*, 572 F.3d 1101, 1107 (10th Cir. 2009).

"[A] government official or supervisory employee may be held liable under section 1983 upon a showing of deliberate indifference to known sexual harassment." *Murrell*, 186 F.3d at 1250.  A plaintiff must prove "(1) a continuing, widespread, and persistent pattern of misconduct by the state; (2) deliberate indifference to or tacit authorization of the conduct by policy-making officials after notice of the conduct; and (3) a resulting injury to the plaintiff." *Rost*, 511 F.3d at 1125.

Significantly, Defendants do not contest that the legal right Plaintiff alleges was violated was clearly established.  Defendants deny only that the Plaintiff has failed to plausibly allege the violation of that statutory or constitutional right.  Specifically, Defendants argue that Plaintiff has failed to plausibly allege deliberate indifference, and that they are therefore entitled to qualified immunity.  (ECF No. 28 at 15–16.) Plaintiff

disagrees, and in response sets forth how she has alleged that each Individual Defendant was deliberately indifferent. The Court will address each individual in turn.

        a.    *Smith*

Defendants argue that Plaintiff has "not alleged facts from which this Court could infer that Mr. Smith . . . caused Plaintiff harm by not suspending Student 1 sooner than November 8." (ECF No. 28 at 19.) The Court disagrees. As discussed above, Plaintiff plausibly alleged that Det. Rush told Smith about the sexual assault and rape, including the on-campus assaults, on November 1. Despite Det. Rush's recommendation to segregate Student 1 from Plaintiff or establish a safety plan for Plaintiff at that time, Smith did not take any action. Indeed, no action was taken to remove Student 1 from BHS until November 8. In the meantime, Student 1 routinely appeared around Plaintiff at BHS, and Student 1's friends openly commented that Plaintiff was trying to ruin Student 1's life because she reported the assault. (ECF No. 15 ¶¶ 37–39.) As a result, Plaintiff came home from BHS in hives. (*Id.* ¶ 40.) Plaintiff has plausibly alleged that Smith knew of the sexual assault and rape, acted with deliberate indifference by failing to do anything after learning of the sexual assault, and that Plaintiff suffered injury as a result. Therefore, and given the limited nature of the qualified immunity argument articulated by the Defendants, Smith is not entitled to qualified immunity, and Defendants' Motion is denied as to him.

        b.    *Weaver*

Defendants next contend that Plaintiff fails to plausibly allege that Weaver was deliberately indifferent given that she had notice of the sexual assault and harassment. (ECF No. 28 at 19–20.) The Court agrees.

Weaver apparently learned of the sexual assault and harassment via two voicemails from Plaintiff's Mother on November 7. (ECF No. 15 ¶ 42, 52.) Weaver returned Plaintiff's Mother's calls that same day, and discussed various options to reduce the harassment Plaintiff experienced at school. (*Id.* ¶¶ 52–53.) Weaver informed Plaintiff's Mother that Student 1 had a right to attend BHS, and suggested that Weaver could not do anything unless criminal charges were filed. (*Id.* ¶¶ 56–57.) However, Student 1 was suspended the following day. (*Id.* ¶ 64.) Weaver then worked to develop a plan for Plaintiff's academics. (*Id.* ¶ 67.) On November 9, Weaver and Quintanilla spoke with Plaintiff's Mother on the phone and in person to discuss options. Later, in early December, Plaintiff's Mother again expressed concerns about harassment and Student 1's appearance on campus. Weaver told Plaintiff's Mother that she had contacted security about Student 1's car. Plaintiff's Mother continued to report episodes of verbal harassment to Weaver. In response to one instance of harassment, Student 4 was reprimanded and order not to contact Plaintiff.

Taken as true, these allegations demonstrate that Weaver promptly responded to Plaintiff's Mother's concerns and moved quickly to address the ongoing harassment as Weaver was made aware of it. They do not plausibly support a claim that Weaver was deliberately indifferent to the ongoing harassment of the Plaintiff. Accordingly, Weaver is entitled to qualified immunity, and the Court grants the Motion as to her.

c.    *Quintanilla*

Plaintiff has similarly failed to state a claim for deliberate indifference against Quintanilla. Plaintiff's Mother first contacted Quintanilla on November 6, and asked her to return the call. Plaintiff's Mother left another message for Quintanilla on November

7. On November 8, Dr. Patterson informed Plaintiff's Mother that Quintanilla was charged with handling the situation. That same day, Quintanilla called Plaintiff's Mother to discuss the sexual assault and harassment. While Quintanilla initially told Plaintiff's Mother that Student 1 could not be suspended for his behavior, BHS suspended him later that day, and Quintanilla relayed that information to Plaintiff's Mother. On November 9, Plaintiff's Mother and Quintanilla talked by phone and in person about the events. Later, on December 6, when Plaintiff's Mother again contacted Quintanilla to express concern about Student 1's return to campus and a lack of protection for Plaintiff at BHS, Quintanilla admitted to a miscommunication with Student 1, explained the difficulty in guaranteeing that Student 1 would not return to campus, and told Plaintiff's Mother that the only way to guarantee no contact would be for Plaintiff to enroll in homebound services.

Taking the facts pled and reasonable inferences therefrom in the light most favorable to Plaintiff, these allegations do not support a claim of deliberate indifference; rather, they show that Quintanilla responded relatively promptly and reasonably to the concerns raised by Plaintiff's Mother. Without more, Plaintiff has not stated a claim against Quintanilla, and Quintanilla is therefore entitled to qualified immunity. Accordingly, the Motion is granted as to her.

        d. *Genereux*

Plaintiff alleges on information and belief that Genereux "would have been informed" of Student 1's prior assault of Student 2, Student 1's rape and sexual assault of Plaintiffs, and the intimidation and harassment of Student 1. (ECF No. 15 ¶ 114.) She also alleges that Genereux would have "communicated about these events with

23

BHS assistant principals, Mr. Smith and Ms. Weaver." (*Id.*)  Finally, Plaintiff alleges that Genereux did not take steps to address Plaintiff's sexual assault and rape, or the subsequent bullying at BHS.  (*Id.* ¶ 115.)

The Court finds that Plaintiff has not plausibly alleged that Genereux acted with deliberate indifference to any knowledge of sexual assault or harassment.  First, Plaintiff does not state *when* Genereux would have had actual knowledge of the sexual assault or harassment.  Absent any indication of when Genereux would have learned of the events, it is difficult to say that Genereux acted with deliberate indifference. Moreover, if Genereux was, as Plaintiff alleges, in communication with Smith and Weaver, presumably Genereux also knew of Weaver's and Smith's efforts to address the situation after November 8.  And as discussed above, the Court has already concluded that Plaintiff failed to allege that Weaver was deliberately indifferent.  On the facts pled in the Complaint, Plaintiff has not plausibly alleged that Genereux was deliberately indifferent.  Accordingly, she is entitled to qualified immunity, and the Court grants the Motion with respect to her.

        e.    *Fiedler*

Plaintiff's alleges that Plaintiff's Mother left a detailed message about the assault and subsequent harassment with Fiedler's receptionist.  (ECF No. 15 ¶ 47.)  Plaintiff also alleges on information and belief that Fiedler "would have been informed" of the phone call.  (*Id.* ¶ 50.)  In addition, Plaintiff claims that Fiedler did not address the sexual assault and rape, or the harassment Plaintiff suffered at BHS.  (*Id.* ¶ 51.)  The day after Plaintiff's Mother called Fiedler, Dr. Patterson, another individual in the District

office, called Plaintiff's Mother to inform her that Quintanilla would handle the situation. (*Id.* ¶ 63.)  Thereafter, Plaintiff's Mother discussed the assault and harassment with Quintanilla.

Defendants argue that Plaintiff has failed to adequately allege that Fiedler had knowledge of the harassment or that he consciously ignored the harassment.  The Court agrees.  First, Plaintiff does not plausibly plead that Fiedler himself had actual knowledge of the assault and harassment.  Moreover, taking reasonable inferences in favor of Plaintiff, Plaintiff has not plausibly pled that, even if Fiedler knew of the assault and harassment, he acted with deliberate indifference.  The day after Plaintiff's Mother called two individuals at the District office, Dr. Patterson followed up and told Plaintiff's Mother that a BHS official, Quintanilla, would work with her to address the situation. Plaintiff has not alleged that it was inadequate for only one of the District officials that Plaintiff's Mother contacted to return her calls.  Plaintiff has thus failed to plead that Fiedler was deliberately indifference to known conduct.  Fiedler is thus entitled to qualified immunity, and the Motion is granted as to him.

### 2.    Official Capacity Claims

"It is well established that [claims against the individual defendants in their official capacities] are to be treated as against the governmental entity the official represents." *Meyer v. Bd. of Cnty. Comm'rs*, 482 F.3d 1232, 1237 (10th Cir. 2007).  "The defense of qualified immunity is only available in suits against officials sued in their personal capacities, not in suits against officials sued in their official capacities."  *Cox v. Glanz*, 800 F.3d 1231, 1240 n. 1 (10th Cir. 2015) (internal quotation marks omitted and alteration incorporated).

The Individual Defendants are employees of the District. (ECF No. 15 ¶ 5.) Because Plaintiff asserts Claim 4 against Individual Defendants in their individual and official capacities, Plaintiff also brings Claim 4 against the District, although the District is not explicitly named as a defendant for that claim. (*Id.* at 24.) Defendants move to dismiss the individual capacity claims, invoking qualified immunity for each of the Individual Defendants, but do not raise any argument as to why the official capacity claim against the District should be dismissed. Accordingly, the Court will not dismiss Claim 4 against the District.

As discussed above, the Court will grant the Motion as to Fielder, Genereux, Quintanilla, and Weaver in their individual capacities. Because the official capacity claims against those individuals are, in essence, a claim against the District, which is already a named defendant in this lawsuit, there is no reason to duplicatively name any of these Individual Defendants in their official capacity as well. On the Court's own motion, therefore, they are also dismissed in their official capacities, and will therefore no longer be party defendants in this action in any capacity.

On the Court's own further motion, the Court will substitute the District as the named defendant for the official capacity claim against Smith because the District is already a party to the suit and Claim 4 is properly brought against the District. With respect to Smith, he remains as a party defendant in his individual capacity only.

**D.      42 U.S.C. § 1983 Equal Protection—Sex Discrimination (Claim 3)**

Plaintiff also sues the Individual Defendants in their individual and official capacities under 42 U.S.C. § 1983, asserting that the Individual Defendants violated Plaintiff's rights under the Equal Protection Clause by discriminating against her on the

26

basis of sex. (ECF No. 15 ¶ 156–73.) Specifically, Plaintiff alleges that Defendants created a hostile environment "because of [Plainitff's] sex," which caused Plaintiff to withdraw from BHS and deprived her of her right to a public education free from sex-based discrimination. (*Id.* ¶¶ 162–63.) Plaintiff also alleges that Fielder, Genereux, Smith, and Weaver "showed deliberate indifference to [Plaintiff's] sexual assault and rape and the subsequent harassment and bullying that occurred on a daily basis at BHS." (*Id.* ¶ 169.)

"[F]ederal courts have dismissed claims pursuant to Fed. R. Civ. Pro. 12(b)(6) when those claims are duplicative of other claims in the suit." *Sw. Re, Inc. v. G.B. Investments Reinsurance Co.*, 2011 WL 13114921, at *1 (D.N.M. June 17, 2011). A court may also own its own motion strike "any redundant, immaterial, impertinent, or scandalous matter." Fed. R. Civ. P. 12(f)(1). "District courts have discretion to dismiss duplicative claims unless they address two separate wrongs." *Thouvenell v. City of Pittsburg, Kan.*, 2018 WL 3068199, at *3 (D. Kan. June, 21, 2018).

Because Plaintiff's sex discrimination claim is premised on deliberate indifference to sexual harassment, Claim 3 appears to be wholly duplicative of Claim 4. Indeed, the parties discuss Claims 3 and 4 together, and seemingly both understand deliberate indifference to sexual harassment to be a central element of the claims. (ECF No. 28 at 16; ECF No. 33 at 12.) And Plaintiff does not appear to allege any form of sex discrimination apart from deliberate indifference to sexual harassment. Accordingly, the Court will dismiss Claim 3 in its entirety. However, since the Court cannot exclude the possibility that Plaintiff intended something other than a deliberate

indifference to sexual harassment claim under § 1983, Claim 3 will be dismissed without prejudice.

**E.      Declaratory and Injunctive Relief (Claim 5)**

Finally, Plaintiff also brings a claim for declaratory and injunctive relief.  (ECF No. 15 ¶¶ 198–203.)  Specifically, Plaintiff requests a declaratory judgment that "Defendants' rules, regulations, policies, and procedures are unconstitutional and void; and Defendants have under color of law deprived her of her rights, privileges, and immunities as guaranteed by the Constitution and Laws of the United States." (*Id.* ¶ 201.)  She also seeks injunctive relief in the form of a temporary restraining order, preliminary injunction, and permanent injunction ordering Defendants to immediately and perpetually refrain from discriminatory conduct.  (*Id.* ¶ 202.)  Finally, Plaintiff requests that the Court award Plaintiff "such other and further relief as this Court may deem proper, including but not limited to requiring Defendants to effect proper training to prevent the recurrence of such conduct."  (*Id.*)

Defendants argue that Plaintiff's claim for declaratory and injunctive relief are derivative of her § 1983 claims, and thus fail because Plaintiff's § 1983 claims are not viable.  (ECF No. 28 at 20–21.)  The Court agrees with the general legal principle that when a request for declaratory or injunctive relief is based on claims that do not survive a motion to dismiss, the request for the related equitable relief should likewise be dismissed.  On this record, however, the Court cannot fully grant Defendants the relief they seek.  As discussed above, Claim 4—the § 1983 deliberate indifference to sexual harassment claim—remains viable and will proceed against the District and Smith in his

individual capacity. Accordingly, the Motion to dismiss the declaratory and injunctive relief claims against the Individual Defendants other than Smith will be granted, but it will be denied with respect to the District and Smith.[4]

Defendants also cursorily argue that Plaintiff lacks standing to pursue an equitable claim because she has not alleged a likelihood of future harm. First, the Court notes that if Plaintiff indeed seeks a temporary restraining order or preliminary injunction (ECF No. 15 ¶ 202), she has failed to bring an appropriate motion for such relief. Fed. R. Civ. P. 65; D.C.COLO.LCivR 65.1; D.C.COLO.LCivR 7.1(d) ("A motion shall be filed as a separate document."). In addition, in the Court's view, Defendants argument and Plaintiff's response do not come close to adequately developing the applicable law or material facts in such a manner as would permit the Court to decide this issue at this time. See *Hunter*, 739 F.3d at 495. For this additional reason the Court will deny Defendants' Motion to dismiss Plaintiff's claim for declaratory and injunctive relief as they pertain to the District and Smith. Plaintiff is on notice, however, that the Court will look closely at these arguments to the extent they are raised in a subsequent motion for summary judgment.

---

[4] The Court notes that the purpose of a declaratory judgment is "to define the legal rights and obligations of the parties in anticipation of some future conduct, not simply to proclaim liability for a past act." *Lawrence v. Kuenhold*, 271 F. App'x 763, 766 (10th Cir. 2008). It appears that Plaintiff's requested declaratory relief addresses both the constitutionality of Defendants' rules and regulations, and liability for a past act. However, because Defendants do not raise the appropriateness of the declaratory relief requested, the Court will not address it at this time. *United States v. Hunter*, 739 F.3d 492, 495 (10th Cir. 2013) (deeming waived an argument inadequately developed in opening brief); *Thompson R2-J Sch. Dist. v. Luke P., ex rel. Jeff P.*, 540 F.3d 1143, 1148 n.3 (10th Cir. 2008) (same); *Rojem v. Gibson*, 245 F.3d 1130, 1141 n.8 (10th Cir. 2001) (same).

## IV. CONCLUSION

For the reasons set forth above, the Court ORDERS as follows:

1. Defendants' Motion to Dismiss (ECF No. 28) is GRANTED IN PART and DENIED IN PART as stated above;

2. The Motion is GRANTED as follows:

   a. Claim 3 is DISMISSED WITHOUT PREJUDICE as to all Defendants; and

   b. Claim 4 is DISMISSED WITHOUT PREJUDICE as to Fielder, Genereux, Quintanilla, and Weaver in their individual and official capacities, and as to Smith in his official capacity;

   c. Claim 5 is DISMISSED WITHOUT PREJUDICE as to Fielder, Genereux, Quintanilla, and Weaver;

3. The remainder of the Motion is DENIED;

4. As to Claim 3, the Court substitutes the District as the proper defendant for the claim against Smith in his official capacity;

5. The stay of discovery pending a decision on the Motion (ECF No. 37) is LIFTED;

6. The parties and the Clerk of Court are DIRECTED to amend the caption of this case in all future filings to reflect the Court's instant Order; and

7. The parties are FURTHER DIRECTED to jointly contact the chambers of U.S. Magistrate Judge N. Reid Neureiter no later than **February 26, 2020** to set a status conference or other such proceeding as Judge Neureiter deems appropriate to move this case forward.

Dated this 24th day of February, 2020.

BY THE COURT:

_____
William J. Martinez
United States District Judge