**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**
**Judge William J. Martínez**

Civil Action No. 19-cv-0950-WJM-NRN

JANE DOE, through her mother and next friend MEGAN DOE,

      Plaintiffs,

v.

BRIGHTON SCHOOL DISTRICT 27J, *et al.*,

      Defendants.

---

## ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

---

Before the Court is the Motion for Summary Judgment ("Motion") filed by

Brighton School District 27J (the "District") and David Smith (jointly, "Defendants").

(ECF No. 67.)  For the reasons stated below, the Motion is granted.

### I. BACKGROUND[1]

Jane Doe attended Brighton High School ("BHS") between her freshman (2016–

2017) and junior (2018–2019) years of high school.  (ECF No. 67 at 2 ¶ 1.)

### A.  Prior Allegation Involving "ED"

On May 10, 2018, a female BHS student ("FHR") had a verbal altercation with a

male student ("ED") at school.  (*Id.* ¶ 2.)  During a meeting to address the altercation,

FHR told her mother and BHS Assistant Principals Jenelle Weaver and David Smith

that another student ("ED") had previously touched her inappropriately at her home.  (*Id.*

---

[1]  The following factual summary is based on the parties' briefs on the Motion, and
documents submitted in support thereof.  The undersigned notes that Plaintiffs admit nearly all
of Defendants' stated material facts and do not add their own Statement of Material Facts to the
record.  (*See generally* ECF No. 75.)  All citations to docketed materials are to the page number

¶ 3.)  Smith reported this allegation to BHS's School Resource Officer, John Grace, who interviewed FHR and her mother about the alleged assault and subsequently referred the matter to the Adams County Sheriff's Office.  (*Id.* at 3 ¶¶ 4–5.)  When Smith conferred with Officer Grace regarding the investigation, Officer Grace told Smith that it was being led by the Adams County Sheriff's Office and that the school staff should not alert ED about the investigation.  (*Id.* ¶ 6.)

**B.     Jane's Allegations**

On October 30, 2018, Detective Marilyn Rush-Lara interviewed Jane (with her mother, Megan Doe, present) as part of her investigation into FHR's allegations.  (*Id.* at 5 ¶ 25.)  During this interview, Jane stated that while she was dating ED earlier in the fall, she and ED had sex at Jane's home.  (*Id.* ¶ 26.)  In this interview, Jane did not allege that while at school, ED had ever assaulted her, sexually harassed her, touched her inappropriately, or spoken to her in a manner she considered unwelcome or inappropriate; nor did she say that she had non-consensual sex with ED.  (*Id.* ¶¶ 27, 29.)  When Detective Rush-Lara asked whether anything occurred at school between her and ED, Jane responded that "it was nothing like that and at school they would just hold hands and kiss."  (*Id.* ¶ 28.)

During this interview, Jane was told "not to talk with anyone about the case while it was investigated, . . . especially not [ED]" so as to not "tip [ED] off about the investigation."  (*Id.* at 9 ¶ 30.)  Jane followed this instruction; she did not communicate with [ED] about [her] allegations and "didn't talk to him again."  (*Id.* ¶¶ 31–32.)

The next day, Jane's Chemistry teacher, Rajean Tiffany, noticed that Jane seemed upset in class and referred her to Ryan Sullivan, a school counsel.  (*Id.* ¶ 34.)

in the CM/ECF header, which sometimes differs from a document's internal pagination.

Sullivan met with Jane, noting that she was "somewhat down" but "calm."  (*Id.* ¶ 35.)

Jane did not explain why she was upset.  (*Id.* at 7 ¶ 36.)  Sullivan also called Megan

about Jane's visit; Megan informed Sullivan that something serious happened with Jane

but would not elaborate "because Detective Rush[-Lara] told [her] not to give out the

details" of the investigation.  (*Id.* ¶ 37.)

Detective Rush-Lara recalls that she spoke with Smith on November 1, 2018,

told him that there was likely a second victim of ED pending a forensic interview, and

asked him to implement a safety plan for Jane.[2]  (*Id.* ¶ 41; ECF No. 67-4 at 15–16.)

During this conversation, Detective Rush-Lara did not inform Smith that ED had

allegedly assaulted, harassed, or touched Jane inappropriately at school.  (ECF No. 67

at 7 ¶ 42; *see also* ECF No. 67-4 at 15–16 (Detective Rush-Lara testified that she "did

not go into what [Jane] had told [her] because [she] didn't have all the details at the

time.").)

On November 5, 2018, Jane participated in a forensic interview, for which

Detective Rush-Lara and her mother were present.  (ECF No. 67 at 8 ¶ 45.)  During this

forensic interview, Jane alleged that ED sexually assaulted her at her home on

September 16, 2018.  (*Id.* ¶ 46.)  She further alleged that: before she broke up with ED,

he would walk her to her car in the parking lot and would "grab her butt" and try and pull

her toward him; she broke up with ED on October 26, 2018 because she and ED

"weren't hanging out that much" and she "got bored"; and after the break-up, she did not

speak with ED.  (*Id.* ¶¶ 47–49.)

---

[2] According to Smith, he did not have this telephone conversation with Detective Rush-Lara until November 2, 2018.  (*Id.* ¶¶ 38–40.)

**C.     The District's Actions**

After the forensic interview, Megan informed Sullivan via e-mail that she was

concerned for Jane, that "the situation is way, way bigger than we could ever have

anticipated," and requested options so that Jane would not have to attend school except

for help in "core subjects."  (*Id.* ¶ 51.)  When Sullivan called Megan the next morning,

Megan informed Sullivan that: Jane had been assaulted; other kids were bothering Jane

at school; ED was "everywhere" and intimidating Jane at school; and Jane wanted to

attend a summer school trip to Greece and enroll in a nursing assistant program at BHS

the next semester.  (*Id.* at 8–9 ¶¶ 52, 55.)  Megan's phone call with Sullivan was the first

time she told a District employee that Jane was assaulted off-campus and was being

bothered by other students at school.  (*Id.* at 10 ¶ 60.)  According to Jane, ED and some

of his friends had been hanging around the entry of Jane's classroom door, which made

her feel uncomfortable, but "not because [ED] had any knowledge that [Jane was] now

saying that [ED] had sexually assaulted [Jane]."  (*Id.* at 9 ¶ 53 (alterations in original).)

However, Jane does not recall ever telling a teacher that ED made her feel

uncomfortable by standing outside her classroom with his friends.  (*Id.* ¶ 54.)

 Sullivan offered Jane three initial options: (1) modify her schedule to avoid ED at

school; (2) switch to a neighboring high school and commute to BHS for the nursing

program, which some students do; or (3) take classes online at home.  (*Id.* ¶ 56.)  The

parties agree that the options Sullivan offered were intended to address Megan's

concerns, help Jane succeed in school, and accommodate her desire to attend the

Greece trip and enroll in the nursing program.  (*Id.* ¶ 58.)

The next day, on November 7, 2018, Sullivan spoke with Megan again, who

stated that Jane still felt unsafe at school.  (*Id.* at 10 ¶ 61.)  That same evening, Megan

also e-mailed Smith that she "needed guidance on what to do with the situation" and stated that she was not satisfied with Sullivan's initial options. (*Id.* ¶ 64.) Smith responded that he would call Megan the following morning. (*Id.* ¶ 65.)

Megan also left messages for Desiree Quintanilla, the District's Intervention Coordinator; Dr. Richard Patterson, the District's Director of Student Achievement; and Weaver. (*Id.* ¶¶ 62–63.) In her voicemail to Weaver, Megan stated that Jane had experienced trauma and needed help. (*Id.* ¶ 62.)

Weaver called Megan back the same evening, and Megan informed Weaver that Jane had recently reported to police that ED sexually assaulted her, that Jane felt anxious to be at school, and that Megan was not satisfied with the options that Sullivan had given her. (*Id.* ¶ 66.) Megan further stated that she preferred that Jane go to BHS for her Math and Chemistry classes because Jane needed more help in those classes. (*Id.* ¶ 67.)

After speaking with Weaver, Megan responded to Smith's e-mail, stating that she had discussed a possible plan for Jane, that ED's friends were allegedly talking about "how girls are ruining [ED's] life" and that she "will have a [doctor's] note sent because [Jane] will no longer come to any classes other than" her Math and Chemistry classes. (*Id.* at 11 ¶ 68.)

On November 8, 2018, Quintanilla called Megan, who stated that Jane had been assaulted by ED, who was under investigation. (*Id.* ¶ 71.) Thereafter, Quintanilla called Smith; they agreed that it would be appropriate to suspend ED pending the investigation, but that Quintanilla would need to confirm Megan's account with the investigating detective. (*Id.* ¶¶ 72–73.) She then called Detective Rush-Lara, who confirmed that ED was under investigation for assault. (*Id.* ¶¶ 74–75.)

That same day, Detective Rush-Lara and Quintanilla called ED's father and explained to him that ED was under investigation for assaulting two victims and scheduled a forensic interview with ED for November 13, 2018.  (*Id.* at 12 ¶¶ 78–79.) "Quintanilla then went to BHS and spoke in person with [Smith] and confirmed that ED was under investigation for the alleged assaults and that they could proceed with the suspension."  (*Id.* ¶ 81.)

Near the end of the school day, Smith and Quintanilla met with and advised ED that he would be suspended.  (*Id.* ¶ 82.)  Quintanilla then called Megan and confirmed that ED had been suspended from school.  (*Id.* ¶ 84.)  ED was suspended for the remainder of the Fall 2018 semester and thereafter was enrolled in a separate high school in the District.  (*Id.* at 13 ¶ 86.)

On a phone call with Smith on November 9, 2018, Megan alleged that ED's friends were "intimidating Jane," that ED was "showing up everywhere," and that ED's friends were loudly stating that "girls are trying to ruin his life."  (*Id.* ¶ 90.)  Smith asked Megan for the names of students bothering Jane so that he could address it, but Megan did not provide him with any names.  (*Id.* ¶ 91.)  Nonetheless, Smith suggested that Jane or Megan could e-mail him, that Jane could anonymously report the harassment through SafeToTell, or that Jane could contact a counselor.  (*Id.* at 14 ¶¶ 92–93.)

On the same day, Megan spoke with Quintanilla and Weaver about an education plan for Jane.  (*Id.* ¶ 94.)  They agreed that Jane would complete her English and History classes online and would complete her Math and Chemistry at BHS.  (*Id.* ¶ 96.) They further agreed to meet in person with Jane on November 14, 2018 to formalize the plan.  (*Id.* ¶ 97.)

In this conversation, Megan asked whether Jane needed an individualized education program ("IEP") or "409 Plan," which staff understood to be a 504 Plan. (*Id.* ¶ 98.) Weaver and Quintanilla informed Megan that it was not necessary to prepare a 504 Plan to move forward with Jane's accommodation plan and suggested that they discuss in December whether a 504 Plan or IEP would be appropriate after Jane had time to stabilize. (*Id.* at 15 ¶¶ 99–100.) Megan agreed. (*Id.* ¶ 100.)

During this phone conversation, Megan again stated that ED's friends were saying that "girls are trying to ruin his life." (*Id.* ¶ 101.) However, when Quintanilla asked whether Jane or Megan could identify the students in Jane's Math or Chemistry classes who were bothering her, Megan said that she could not. (*Id.* ¶ 102.) Quintanilla stated that if Jane is being bothered at school, "she needs to let the [school administration] know," and that the school would address it. (*Id.* ¶ 103.)

On November 14, 2018, Megan, Jane, Smith, Weaver, Sullivan, Quintanilla, and Stephanie Mitchell, the District "homebound" coordinator, met and agreed on Jane's education plan. (*Id.* at 15–16 ¶¶ 104–05.) Megan again asked if there is "any way you guys can evaluate her and see if there's like any other services she might need in general . . . ?" (*Id.* ¶ 106.) Weaver and Quintanilla stated that BHS could evaluate Jane for an IEP or a 504 Plan, but they advised against initiating one at that time since Jane was in crisis and they were concerned that evaluation data would not accurately reflect Jane's needs. (*Id.* ¶ 107.) "The group would reconsider an evaluation in December after Jane stabilized." (*Id.* ¶ 108.) Megan also asked if BHS could provide a tutor for Jane, but Weaver said the school did not have a tutor to provide. (*Id.* ¶¶ 109.)

During this conversation, Megan again asserted that Jane was being bullied and intimated at school. (*Id.* ¶ 110.) Staff again asked for the names of any students

7

bothering Jane, but neither Megan nor Jane provided any names.  (*Id.* ¶ 111.)  Staff

further asked Jane whether any such students were in her Math and Chemistry classes,

and Jane confirmed that there "hasn't been a problem in those classes."  (*Id.* ¶ 112.)

Staff also informed Jane that if she ever felt unsafe on campus, or if anyone was

bothering her, she could contact an adult at the school, including Sullivan.  (*Id.* ¶ 113.)

On November 16, 2018, Megan e-mailed Williams asking for tutoring options to

help get Jane caught up in her Math class.  (*Id.* at 18 ¶ 120.)  Williams responded the

same day, providing Megan with on-campus tutoring times and offering Jane extra time

to finish assignments.  (*Id.* ¶ 121.)  Megan then reported that Jane was in the hospital

"for mental health" but would likely be back after Thanksgiving Break.  (*Id.* ¶ 122.)

Thereafter, on November 26, 2018, Megan again e-mailed Weaver, Smith, and

Sullivan, expressing her concerns that Jane was falling behind in Math and Chemistry.

(*Id.* at 19 ¶ 127.)  Even though school was not in session that day, Weaver and Smith

called Megan back that afternoon and discussed her concerns about Jane's

coursework.  (*Id.* ¶¶ 128–29.)  The following day, Smith called Megan and scheduled a

meeting for the following day between Megan, Jane, and Jane's Math and Chemistry

teachers to "come up with a solution" to Jane's concerns related to her coursework.  (*Id.*

¶ 132.)  That meeting occurred on November 28, 2018, during which time the group

discussed Jane's academic progress and created a revised plan to help Jane manage

the coursework through the end of the semester; her Math and Chemistry teachers

further agreed to "additional accommodations" for Jane, including exempting Jane from

Chemistry lab, waiving some assignments, allowing Jane extra time to complete some

assignments, and volunteering to set aside their planning periods to work individually

with Jane.  (*Id.* at 20 ¶¶ 135–36.)

On December 4, 2018, ED returned to BHS because he mistakenly believed his suspension had ended.  (*Id.* at 21 ¶ 140.)  When BHS staff realized he was at school, they escorted him to his car, and Weaver called Megan to report that ED had been on campus that morning.  (*Id.* ¶¶ 141, 143.)  Moreover, after Megan e-mailed Smith and Sullivan alleging that ED had also been on campus before December 4, 2018, Weaver and Smith called Megan and informed her that they were investigating her allegation. (*Id.* ¶¶ 144–45.)

On December 9, 2018, Megan e-mailed Weaver a letter from a physician's assistant stating that Jane is "not medically stable to return to school."  (*Id.* at 22 ¶ 151.) Thereafter, Weaver informed Jane's teachers that Jane would not be returning for the semester and followed up with Jane's Catering class teacher, who confirmed that Jane would earn an A for the semester.  (*Id.* ¶ 155.)  She also spoke with Megan regarding Jane's options to complete Math and Chemistry, including finishing her studies from home or taking "incompletes" and making up the coursework when she returned to school.  (*Id.* ¶ 156.)

Ultimately, in the Fall 2018 semester, Jane earned As in History, Catering, and Choir, a B in English, and Ds in both Math and Chemistry.  (*Id.* at 23 ¶¶ 158–59.)  Jane finished that semester with a higher-grade point average than she had earned the prior semester.  (*Id.* ¶ 163.)

The District subsequently worked with Megan to register Jane for the homebound program full-time for the Spring 2019 semester and assigned a highly qualified teacher who was skilled at building student trust to serve as Jane's homebound teacher.  (*Id.* at 24 ¶¶ 165–171.)  Jane completed the Spring 2019 semester with Bs in all of her courses.  (*Id.* at 25 ¶¶ 174–75.)

**C.      The IDEA Administrative Complaint**

On January 23, 2019, Megan filed a due process complaint pursuant to the

Individuals with Disabilities Act ("IDEA"), 20 U.S.C. § 1400, *et seq.*, alleging that the

District had failed to timely identify Jane as a "child with a disability" given her mental-

health diagnoses related to the alleged assault.  (*Id.* ¶ 176.)  The District conducted an

IDEA evaluation and held a meeting on April 4, 2019 with Megan and Jane to determine

whether Jane qualified for IDEA services.  (*Id.* ¶ 177.)  The District staff member present

at the meeting concluded that Jane did not qualify for IDEA services.  (*Id.* ¶ 178.)

The District further created a Section 504 accommodation plan for Jane, which

provided:

> a range of academic accommodations . . . , nearly all of
> which were either utilized with Jane or available to her
> before the plan was formulated.  In addition to academic
> accommodations, the plan provided four hours per month of
> mental health services to help her develop strategies for
> sustaining attention, shifting back to a task, and developing
> coping skills to academic demands.

(*Id.* ¶¶ 179–80 (internal citations omitted).)

**D.      ED's Charges and Subsequent Events**

ED was charged with assault in January 2019, although the charge against him

related to Jane was subsequently dismissed.  (*Id.* at 26 ¶¶ 182, 187.)  After he was

charged, ED's then-girlfriend accused Jane via text message of lying about the assault

and stated she hopes "no one ever forgives you."  (*Id.* ¶ 183.)  Megan contacted the

District regarding the text, and Weaver and Smith immediately contacted ED's girlfriend

at school, instructed her not to contact Jane again, and had her sign a no-contact

agreement.  (*Id.* ¶¶ 184–85.)

Jane and her family moved to Texas in 2019 after her junior year at BHS, at which point she was on pace to graduate early.  (*Id.* at 27 ¶ 188.)

## D.   The Instant Action

Jane, through her mother and next friend Megan, (jointly, "Plaintiffs") filed this action on April 1, 2019 and filed the Amended Complaint with Jury Demand on April 13, 2020.  (ECF Nos. 1, 56.)  Plaintiffs assert the following claims: (1) deliberate indifference to sexual harassment in violation of Title IX of the Education Amendments of 1972 ("Title IX"), 20 U.S.C. §§ 1681(a), *et seq*., against the District (¶¶ 132–48)[3]; (2) retaliation in violation of Title IX against the District (¶¶ 149–58); (3) deliberate indifference to sex discrimination in violation of the Equal Protection Clause of the Fourteenth Amendment against Smith and the District (¶¶ 159–82); (4) a request for a declaratory judgment and injunctive relief (¶¶ 183–88); and (5) violation of Section 504 of the Rehabilitation Act, 29 U.S.C. § 794, against the District (¶¶ 189–207).

On January 19, 2021, Defendants filed the Motion for Summary Judgment.  (ECF No. 67.)  Plaintiffs responded on February 16, 2021 (ECF No. 75), and Defendants replied on March 2, 2021 (ECF No. 79).

## II. STANDARD OF REVIEW

Summary judgment is warranted under Federal Rule of Civil Procedure 56 "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248–50 (1986).  A fact is "material" if, under the relevant substantive law, it is essential to proper disposition of the claim.  *Wright v.*

---

[3] Citations to (¶ __), without more, are references to the Amended Complaint with Jury Demand.  (ECF No. 56.)

*Abbott Labs., Inc.*, 259 F.3d 1226, 1231–32 (10th Cir. 2001).  An issue is "genuine" if the evidence is such that it might lead a reasonable trier of fact to return a verdict for the nonmoving party.  *Allen v. Muskogee*, 119 F.3d 837, 839 (10th Cir. 1997).

In analyzing a motion for summary judgment, a court must view the evidence and all reasonable inferences therefrom in the light most favorable to the nonmoving party. *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 670 (10th Cir. 1998) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)).  In addition, the Court must resolve factual ambiguities against the moving party, thus favoring the right to a trial.  *See Houston v. Nat'l Gen. Ins. Co.*, 817 F.2d 83, 85 (10th Cir. 1987).

## III.  ANALYSIS

### A.    Title IX Discrimination & Equal Protection Clause Claims

Title IX provides, that "[n]o person . . . shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance . . . ."  20 U.S.C. § 1681(a).  A school recipient of federal funds may be liable under Title IX for its own conduct in being deliberately indifferent to student-on-student sexual harassment. *Davis v. Monroe Cnty. Bd. of Educ.*, 526 U.S. 629, 643 (1999).

A school district may be liable under Title IX provided it: (1) has actual knowledge of, and (2) is deliberately indifferent to, (3) harassment that is so severe, pervasive, and objectively offensive as to (4) deprive access to the educational benefits or opportunities provided by the school.  *See Rost ex rel. K.C. v. Steamboat Springs RE-2 Sch. Dist.*, 511 F.3d 1114, 1119 (10th Cir. 2008) (citing *Murrell v. Sch. Dist. No. 1, Denver, Colo.*, 186 F.3d 1238, 1246 (10th Cir. 1999)).

Moreover, the Tenth Circuit analyzes claims for discrimination under the Equal Protection Clause using the same substantive standards of civil rights laws prohibiting discrimination as Title VII and Title IX.  *See Baca v. Sklar*, 398 F.3d 1210, 1218 n.3 (10th Cir. 2005) (Title VII and § 1983 claims are analyzed pursuant to the same standards); *Hiatt v. Colo. Seminary*, 858 F.3d 1307, 1315 n.8 (10th Cir. 2017) (equating substantive standards of Title VII and Title IX).

Defendants argue that Plaintiffs have failed to raise a genuine dispute of material fact regarding her Title IX and Equal Protection Clause claim because: (1) no "appropriate person" had actual knowledge of any discriminatory conduct before November 7, 2018; (2) Jane was not subjected to "severe, pervasive, and objectively offensive" harassment under the District's control; and (3) District officials were not deliberately indifferent to the alleged harassment.  (ECF No. 67 at 27–34, 41–42.)  The Court begins its analysis of this claim with the parties' arguments regarding the District's deliberate indifference.

In order to confine Title IX liability to those cases in which the school district itself acted improperly, *Davis* imposes liability only if the district remains deliberately indifferent to acts of student-on-student harassment of which it has actual knowledge. 526 U.S. at 643.  In describing the proof necessary to satisfy the standard, the Supreme Court does not require a school district to "remedy" sexual harassment or to ensure that students conform their conduct to certain rules; rather, a school district is deliberately indifferent to acts of student-on-student harassment "only where the [district's] response to the harassment or lack thereof is clearly unreasonable in light of the known circumstances."  *Id.* at 648–49; *accord Rost*, 511 F.3d at 1121.  "[T]he deliberate indifference must, at a minimum, 'cause [students] to undergo' harassment or 'make

them liable or vulnerable' to it."  *Davis*, 526 U.S. at 645 (alterations in original); *see also*

*Bd. of Cnty. Comm'rs of Bryan Cnty., Okla. v. Brown*, 520 U.S. 397, 407 (1997) (noting

"[a] showing of simple or even heightened negligence will not suffice" under the

deliberate indifference standard); *Barrie v. Grand Cnty., Utah*, 119 F.3d 862, 869 (10th

Cir. 1997) (deliberate indifference requires more than "negligence, or even gross

negligence").

Defendants argue that Plaintiffs have failed to raise a genuine dispute of material

fact that District officials were deliberately indifferent to Jane's harassment claims.

(ECF No. 67 at 32–34.)

Plaintiffs respond that

> a reasonable jury could conclude that Defendant Smith had
> actual knowledge of a substantial risk of sexual harassment
> at school on November 1, 2018, when Det[ective] Rush-Lara
> informed him that [Jane] was the second victim of sexual
> assault by STUDENT 1 and that a safety plan was needed,
> in light of Defendant Smith's previous knowledge of
> STUDENT 1's first sexual assault and subsequent
> altercation with his first victim on school grounds and the
> need for a safety plan in that case.  Defendant Smith did
> nothing to respond to such actual knowledge of a substantial
> risk of sexual harassment until November 8—a week later.

(ECF No. 75 at 17–18.)

Plaintiffs further argue that "[t]he only solution to the harassment that District

officials offered was for Megan or [Jane] to offer names of bullying her, but . . . when

that solution proved ineffective in dealing with the harassment, the District's failure to

provide any other solutions to the students' harassment of [Jane] on school grounds[ ]

constitutes deliberate indifference."  (*Id.* at 18 (citing *Vance v. Spencer Cnty. Pub. Sch.

Dist.*, 231 F.3d 253, 260 (6th Cir. 2000) (recognizing that "[w]here a school district has

actual knowledge that its efforts to remediate are ineffective, and it continues to use

those same methods to no avail, such district has failed to act reasonably in light of the known circumstances")).)

However, even taking Detective Rush-Lara's account as true, the Court finds that Plaintiffs have failed to present evidence from which a reasonable jury could conclude that the District acted with deliberate indifference by waiting until November 8, 2018 to take actions in response to Jane's allegations.  After all, during this November 1, 2018 phone call, Detective Rush-Lara did not tell Smith that ED had allegedly assaulted, harassed, or touched Jane inappropriately at school, and Plaintiffs do not point to any other evidence in the record from which the District should have known that Jane was being harassed on school grounds.  (*See* ECF No. 67 at 7 ¶ 42.)

Indeed, the record reflects that the full scope of the situation was not immediately known to the District.  (*Id.* at 8 ¶ 51 (Megan e-mailed Sullivan after Jane's November 5, 2018 forensic interview that "the situation is way, way bigger than we could ever have anticipated").)  Moreover, Plaintiffs admit that the Megan's November 6, 2018 phone call with Sullivan was the first time that "Megan told a District employee that Jane was assaulted off-campus and was being bothered by ED and other students at school."  (*Id.* at 10 ¶ 60.)

Thereafter, the District provided Jane with options to modify her schedule, including taking classes at home, and altered its proposed plan for Jane's education on numerous occasions in response to Megan and Jane's concerns.  (*Id.* at 9–11 ¶¶ 56–58, 66, 68, 94–97, 104–05, 120–21, 132–36, 154–56.)  The District then suspended ED on November 8, 2018, just two days after Megan's November 6, 2018 phone call to Sullivan.  (*Id.* ¶¶ 84, 87.)  Between November 6 (when Megan first reported Jane's assault to Sullivan) and December 4, 2018 (when Megan removed Jane from school),

Megan had no fewer than *13 calls or meetings* with BHS or the District regarding Jane's concerns and educational plan.  (*Id.* at 21 ¶ 149 (emphasis added).)

Moreover, Plaintiffs' assertion that the District failed to provide any solutions to other students' harassment of Jane is not borne out by the evidence of record.  For example, in addition to repeatedly informing Jane that they would address the harassment if Megan and/or Jane provided the names of the perpetrators to District officials, Smith suggested that Jane could e-mail him, anonymously report the harassment through SafeToTell, or contact a counselor.  (*Id.* ¶¶ 92–93, 102–03, 111–13.)  In the Court's view, the fact that Jane and Megan repeatedly refused to provide the names of the students harassing Jane to the District severely weakens Plaintiffs' argument that the District acted with deliberate indifference by failing to address other students' bullying of Jane.  After all, the District cannot take actions against specific students when it does not know the identity of those students.  However, tellingly, when the District learned that ED's then-girlfriend sent Jane a text message accusing Jane of lying about the assault and stating that she hopes "no one ever forgives you," Weaver and Smith "immediately contacted ED's girlfriend at school, instructed her not to contact Jane again[,] and had her sign a no-contact agreement."  (*Id.* ¶¶ 183–85.)

Based on the record before it, the Court concludes that Plaintiffs have failed to present evidence from which a reasonable fact finder could conclude that the District acted with deliberate difference after being placed on notice of Jane's sexual assault and harassment allegations.  *Cf. Kinman v. Omaha Pub. Sch. Dist.*, 171 F.3d 607, 610 (8th Cir.1999) (finding student failed to make necessary showing that school district acted with deliberate indifference after being placed on notice of sexual harassment by teacher, as required for claim against school under Title IX, where the district did not

"turn a blind eye" to the allegations and instead investigated them and initiated termination proceedings once they obtained conclusive proof of the relationship). Plaintiffs' Title IX discrimination claim and Equal Protection Clause claim therefore fail as a matter of law.

Accordingly, the Court grants summary judgment in favor of Defendants as to Plaintiffs' Title IX discrimination and Equal Protection Clause claims.[4]

## C.    Title IX Retaliation Claim

Title IX prohibits retaliation against individuals because they have complained of sex discrimination. *See Hiatt*, 858 F.3d at 1315 (citing *Jackson v. Birmingham Bd. of Educ.*, 544 U.S. 167, 183 (2005)). To prove a prima facie case of Title IX retaliation, Plaintiffs must show that: (1) Jane engaged in protected activity; (2) the District knew of the protected activity; (3) the District took a material, adverse action against Jane; and (4) there was a causal connection between the protected activity and the adverse action. *See Tackett v. Univ. of Kan.*, 234 F. Supp. 3d 1100, 1109 (D. Kan. 2017). Where a plaintiff does not have direct evidence of retaliation, a plaintiff may rely on the burden-shifting framework from *McDonnell Douglas Corporation v. Green*, 411 U.S. 792, 802–04 (1973). *See Hiatt*, 858 F.3d at 1315 n.8.

Under *McDonnell Douglas*, if Plaintiffs establish a prima facie case of retaliation, then the burden shifts to Defendants to "articulate a legitimate, non-discriminatory basis" for its action. *See id.* at 1316. If Defendants satisfy this burden, then "summary

---

[4] Because the Court finds that Plaintiffs have failed to present evidence suggesting that the District acted with deliberate indifference, the Court need not address Defendants' remaining arguments relating to Plaintiffs' Title IX discrimination claim and Equal Protection Clause claim.

judgment is warranted unless [Plaintiffs] can show there is a genuine issue of material fact as to whether the proffered reason[ ] [is] pretextual." *Id.*

"[A] plaintiff may show pretext by demonstrating the proffered reason is factually false, or that discrimination was a primary factor in the [defendant's] decision. This is often accomplished by revealing weaknesses, implausibilities, inconsistencies, incoherences, or contradictions in the [defendant's] proffered reason, such that a reasonable fact finder could deem the [defendant's] reason unworthy of credence." *DePaula v. Easter Seals El Mirador*, 859 F.3d 957, 970 (10th Cir. 2017) (internal citations and quotation marks omitted). "The relevant inquiry is not whether the [defendant's] proffered reasons were wise, fair or correct, but whether it honestly believed those reasons and acted in good faith upon those beliefs." *Hiatt*, 858 F.3d at 1316 (quoting *Swackhammer v. Sprint/United Mgmt. Co.*, 493 F.3d 1160, 1169–70 (10th Cir. 2007)).

The Court will assume, for purposes of this Order only, that Plaintiffs have established a prima facie case of retaliation.

Defendants argue that there is no evidence that the District's stated basis for its actions—accommodating Jane's schedule to access her coursework in the manner requested and not initiating evaluations while she is in crisis—amounts to a pretext for unlawful retaliation. (ECF No. 67 at 38.)

In response, Plaintiffs argue that "a reasonable jury could conclude the District's proffered reason for not providing [Jane] a special education evaluation was mere pretext for retaliation" based on the following facts:

- The short time between when Jane and Megan complained of Jane's sexual assault and bullying and the District's refusal to provide Jane a

special education evaluation;

- That a school district has an affirmative duty to evaluate students who are suspected of needing special education;

- That Megan requested a special education assessment for Jane twice, which the District refused; and

- That following Megan's requests for a special education evaluation for Jane, Jane became unable to continue to attend BHS is person, had to go to homebound services, and showed serious academic difficulties.

(ECF No. 75 at 21–22.)

However, none of Plaintiffs' arguments create a reasonable inference that Defendants' proffered reason for delaying Jane's secondary evaluation was a mere pretext for discrimination. Indeed, the short time frame between Jane's coming forward with allegations of sexual assault and the District's denial of an immediate IEP or 504 Plan assessment does not demonstrate weaknesses or implausibilities in the District's account given the fact that the District was responding in real time to developing information regarding Jane's allegations and educational needs.

To the contrary, the short time frame is actually consistent with the District's proffered explanation that it wanted to postpone its assessment until Jane was not in crisis. (ECF No. 67 ¶¶ 99–100, 106–08.) The undisputed record reflects that the District engaged in numerous conversations regarding Jane's educational needs, gave her numerous accommodations, and promptly addressed her and Megan's concerns. (*Id.* ¶¶ 56–58, 66, 68, 94–97, 104, 120–21, 132–36, 154–56.)

Based on the record before it, the Court finds that Plaintiffs have failed to come forward with any evidence from which a reasonable fact finder could conclude that the District's explanation for not evaluating Jane in November was a pretext for unlawful retaliation. Accordingly, the Motion is granted as to this claim.

**D.      Rehabilitation Act Claim**

Section 504 of the Rehabilitation Act provides:

> No otherwise qualified individual with a disability in the
> United States . . . shall, solely by reason of her or his
> disability, be excluded from the participation in, be denied
> the benefits of, or be subjected to discrimination under any
> program or activity receiving Federal financial assistance
> . . . .

29 U.S.C. § 794(a).

"A prima facie case under § 504 consists of proof that (1) plaintiff is handicapped

under the Act; (2) he is 'otherwise qualified' to participate in the program; (3) the

program receives federal financial assistance; and (4) the program discriminates

against plaintiff." *Miller v. Bd. of Educ. of Albuquerque Pub. Schs.*, 565 F.3d 1232, 1245

(10th Cir. 2009).  To recover compensatory damages under the Rehabilitation Act,

Plaintiffs must prove intentional discrimination, which can be inferred form deliberate

indifference.  *Powers v. MJB Acquisition Corp.*, 184 F.3d 1147, 1153 (10th Cir. 1999).

Defendants argue that Plaintiffs have failed to raise a genuine issue of material

fact that the District discriminated against Jane based on a disability.  (ECF No. 67 at

42–43.)  They argue that there is no genuine dispute that District staff provided Jane

with the accommodations that she needed immediately before being provided any

documentation regarding Jane's diagnosis and before they would have known that Jane

was "disabled" within the meaning of Section 504.  (*Id.* at 44.)

Plaintiffs respond that "a reasonably jury could conclude that the [District]

discriminated against [Jane] on the basis of disability by failing to provide her an

evaluation and reasonable accommodations when it knew she required them" and that

notwithstanding the fact that Megan requested a special education evaluation on two

occasions, the District did not complete a special education evaluation until after Megan filed an IDEA complaint against the District.[5]  (ECF No. 75 at 25.)

The Court finds that Plaintiffs have failed to point to any evidence in the record demonstrating that the District discriminated against Jane on the basis of her disability or otherwise acted with deliberate indifference.  To the contrary, the record demonstrates that District staff began immediately working to provide Jane with accommodations after she came forward about her alleged assault on November 5, 2018 and provided Jane with additional accommodations over time as her educational needs and preferences changed.  (ECF No. 67 ¶¶ 56–58, 66, 68, 94–97, 104, 120–21, 132–36, 154–56.)  The record further establishes that Jane and Megan agreed with the accommodation plans that the District created for Jane, including Weaver and Quintanilla's suggestions that the District delay evaluating Jane for a 504 Plan or IEP until she had time to stabilize.  (*Id.* ¶¶ 96, 99–100, 105, 108, 137[6].)

Moreover, the District's explanation that it did not want to evaluate Jane while she was in crisis does not suggest that it intended to discriminate against Jane on the basis of her disability, and Plaintiffs point to no evidence in the record suggesting that the District acted with any discriminatory intent.  To the contrary, the record reflects that the District reasonably accommodated Jane immediately upon learning of Jane and Megan's concerns.  (*See* ECF No. 67 ¶ 58 (recognizing that Sullivan's initial options for

---

[5] However, as Defendants point out, the Administrative Law Judge already concluded that the District complied with the IDEA, and, at any rate, "a denial under the IDEA does not ineluctably establish a violation of § 504."  *Miller*, 565 F.3d at 1246.

[6] In their response to Defendants' statements of material facts, Plaintiffs denied the assertion that "[t]here was no disagreement about the revised plan created at the November 28, 2018 meeting"; critically, however, Plaintiffs point to no evidence in the record supporting their denial.  (ECF No. 75 at 8 ¶ 137.)

Jane "were intended to address Megan's concerns, help Jane succeed in school, and accommodate [Jane's] desire to attend the Greece trip and enroll in the nursing program"); ¶ 89 (Smith assured Megan that "he wanted Jane to feel safe" and "wanted her to get credits to be successful in school"); ¶ 180 (recognizing that the 504 Plan that was eventually prepared for Jane provided a "range of academic accommodations for Jane, nearly all of which were either utilized with Jane or available to her before the plan was formulated").).

As such, the Court finds that Plaintiffs have failed to demonstrate a genuine issue of material fact that the District discriminated against Jane. Accordingly, this portion of the Motion is granted.

**E.      Claims for Declaratory and Injunctive Relief**

Because the Court has granted summary judgment in favor of Defendants as to Plaintiffs' substantive claims, the claims for derivative injunctive and declaratory relief also fail. *See Young v. Wells Fargo Bank, N.A.*, 717 F.3d 224, 242 (1st Cir. 2013) (dismissing derivative equitable claims after dismissal of underlying claims); *Gates v. Sprint Spectrum, L.P.*, 523 F. Supp. 2d 1287, 1291 (D. Kan. 2007) (same).

## IV.  CONCLUSION

For the reasons set forth above, the Court ORDERS as follows:

1.      Defendants' Motion for Summary Judgment (ECF No. 67) is GRANTED;

2.      The Clerk shall enter judgment in favor of Defendants Brighton School District 27J and David Smith and against Plaintiffs Jane Doe, by and through her mother and next friend Megan Doe, and shall terminate this case; and

3.      Defendants shall have their costs, if any, upon compliance with

D.C.COLO.LCivR 54.1.

Dated this 21st day of September, 2021.

BY THE COURT:

_____
William J. Martinez
United States District Judge